JOHN MILLER, MORRIS S. MILLER, CHARLES W. STAFFORD
and JACOB DRYFUS, Appellees, v. HAWKEYE GOLD
DREDGING COMPANY, LTD., C. H. KURTZ, E. C. CLARK,
E. W. DINGWELL, A. C. CLARK, H. D. OVERHOLTZ
and GEORGE T. HEDGES, Appellants.

**Parties:** MISJOINDER AS PLAINTIFFS. The statute providing that all parties having an interest in the subject of an action and in the relief demanded may be joined as plaintiffs, unless it is otherwise provided, is designed to apply to all actions the rules which formerly obtained in chancery practice; but they must have a common interest in the cause of action and the relief sought, it is not sufficient that they each have a right of action growing out of the same transaction if the relief sought by each be distinct and unconnected. Hence in an action by several persons against a corporation and its directors to impress a lien upon an alleged trust fund, where no one plaintiff was interested in the cause of action or relief demanded by others, it was error not to require an election of the particular plaintiff in whose name the action should be prosecuted and a dismissal as to all others.

**Actions:** TRANSFER OF CAUSES: HARMLESS ERROR. Refusal to transfer an action demanding only a money judgment to the equity side of the docket was harmless error, where by a subsequent amendment to the petition an equitable cause of action was pleaded and equitable relief demanded.

**Corporations:** PAYMENT FOR STOCK: CONVERSION: RIGHTS OF STOCKHOLDERS. A shareholder is not by virtue of that fact alone a corporate creditor, and he has no distinct right to any of the corporate property; but the corporation may become indebted to him the same as to a stranger: So that where the corporation refused to apply money tendered in payment of stock subscriptions to that purpose, but accepted and retained the same, converting it to its own use, its liability was the same as for the conversion of the property of a stranger.

**Same:** RIGHTS OF STOCKHOLDERS: INJUNCTION. Stockholders seeking to establish a lien on funds of the corporation are not entitled to a temporary injunction restraining the corporation from otherwise disbursing the fund, where there is no allegation of insolvency and they are only entitled to a money judgment.

*Appeal from Linn District Court.*—HON. MILO P. SMITH, JUDGE.

FRIDAY, SEPTEMBER, 27, 1912.

FROM a decree declaring certain sums owing plaintiffs, and establishing liens on an alleged trust fund on deposit with the Cedar Rapids National Bank and ordering payment therefrom, the defendants appeal—*Reversed.*

*Crissman, Linville & Churchill* and *Dawley & Wheeler,* for appellants.

*Grimm & Trewin,* for appellees.

LADD, J.—The Fraser river, having its source near the headwaters of the Yukon, flows south into the Straits leading to the Pacific Ocean. For many years the Indians washed gold from the debris along its shores. Citizens of this state laboring under the delusion that doing so by machinery would prove feasible, as well as profitable, organized a corporation, known as the Iowa Lillooet Mining Company, Limited, under the laws of British Columbia, with its principal place of business at Lillooet, B. C., and through it launched on the river a dredge boat equipped with machinery, with the design of acquiring the gold which they had imagined had been accummulating beneath its waters for centuries. This was in 1903, and, as rumors of treasures to be found reached Iowa from afar off, greed of gain grew, and another company, the Hawkeye Gold Dredging Company, Limited, was promoted to take care of the gold at the bottom of some unappropriated portion of the stream. Though Lillooet was named in the articles of each company as the principal place of business, this was in fact at the office of B. B. Bliss, secretary of both companies, in Iowa Falls. In anticipation of what might

happen, the stock in the company first organized rapidly advanced in market value, and, as a consequence the shares of capital stock in that being promoted, were sold, as it were, in a day, and not until all were gone was it realized that some who had parted with their money to exploit the first enterprise had not been afforded an opportunity to participate in the last. It is said, by more than one witness, that the people of Charles City were clamorous for stock, and owing to profound sympathy for them, Mrs. Hamilton, stenographer of the secretary and designated on the prospectus as assistant treasurer of the company, telephoned to John T. Bailey, then at Iowa City, that it would be to his advantage to come to Iowa Falls. Upon arrival, he found her in charge of the office, Bliss and others having gone to British Columbia to formally organize the company, and the "advantage" to Bailey suggested was that he dispose of stock to the aforesaid people of Charles City. After considerable parley, it was arranged that the shares should be sold at fifteen cents each, of which Bailey should retain two cents as commission, remit three cents to Mrs. Hamilton, and whatever more was paid (the par value being ten cents per share) should be turned over to the company. She claimed that these shares were some for which others had subscribed; and one controversy is as to whether the purchasers were to be regarded as original subscribers, and therefore required to pay but twenty-five percent of the par value in cash and the remainder in five equal monthly installments, or were taking the shares from original subscribers, who had paid in part or wholly therefor, and were to pay in full and stand in the place and stead of their predecessors.

The evidence bearing on the issue was in sharp conflict, and was such that, had the cause been submitted to the jury, we could not have interfered with the verdict returned. Many persons at Charles City either subscribed for or purchased stock through Bailey, as did the plain-

tiffs, John Miller, 20,000 shares, Jacob Dreyfus, 3,500 shares, M. S. Miller, 1,500 shares, and Charles W. Stafford, 1,000 shares. The subscriptions of each of these persons were separate, and each paid twenty-five percent of the par value and received a separate receipt therefor, signed by "B. B. Bliss, Secretary Hawkeye Gold Dredging Co., Limited, per M. V. H." (Mrs. Hamilton.) A few days later the remaining seventy-five percent of the par value of their stock was remitted through John Miller and similar receipts issued.

As we understand the record, incorporation was effected under the laws of British Columbia, May 19, 1904; and the incorporators met in Iowa Falls June 22d thereafter and elected directors, and on the same day the directors selected officers of the company. On the next day a committee to obtain information with respect to a contract for dredging and report, and to act when directors were not in session, was appointed. The stockholders met August 24 and adjourned until August 30, 1904, when a resolution was adopted, proposing to acquire a certain mining lease from four stockholders in consideration of 1,600,000 shares of stock and $10,000 in money. It was also ordered that subscriptions on which there had been no payment be vacated, and resolved that "no money be paid out and no expenses be incurred, except the ordinary clerk hire, postage, stationery, and necessary incidental expenses, until it shall be demonstrated to the satisfaction of our board of directors that the dredge now in operation by the Iowa Lillooet Gold Mining Company has proven its ability to earn substantial dividends on the stock of said company, in which event our board of directors shall submit plans and specifications for the building of dredges to a meeting of the stockholders of this company for authorization by such stockholders' meeting to enter into contract for the building of such dredges." "Also that a special meeting of the stockholders be held Dec. 1,

1904, at which meeting, if it shall appear that the dredge operated and owned by the Iowa Lillooet Company has not earned substantial dividends on the stock of said company, and that it has not proven a financial success, we favor taking provision at such meeting as shall return the money held by this company to the stockholders, less the incidental expenses heretofore referred to."

Up to this time no stock had been issued. No action had been taken, save as above stated, recognizing any one as stockholder, and, though the minutes of the meetings refer to those present as stockholders, they held no evidence in the way of certificates showing them to be such. The directors elected at the meeting last mentioned met August 10, 1904, and, after electing officers, a counterproposition for the acquirement of the mining lease was accepted; and it was ordered that there "be issued to all subscribers of stock a stock certificate on the form now printed, signed by the president or vice-president and countersigned by the secretary, with seal of the company attached," the stock certificates and the record to indicate the amount paid thereon. The directors also resolved that "in pursuance to the recommendation of the stockholders all original subscribers who have paid on their stock in excess of the twenty-five percent assessment be returned all amounts in excess of twenty-five percent."

On September 24th following another meeting was had, at which the office of secretary was declared vacant and resolution to refund was suspended and W. L. Crissman appointed attorney for the company. All books and papers of the company which had not previously been destroyed were removed to the office of Crissman & Sargent at Cedar Rapids, upon the discovery by the attorney of derelictions on the part of the secretary and treasurer. On December 1, 1904, the board of directors, in pursuance of the articles, appointed a committee of three, including Mr. Crissman, as an executive committee, with full power to act in behalf

of the company in all matters, and by direction of this committee all payments above twenty-five percent of the par value of stock originally subscribed were refunded, save to plaintiffs. Mr. Crissman, in a report to the directors on January 20, 1905, stated that the claims of plaintiffs required special consideration, and explained in his testimony that "the theory of that was that we were convinced, the board of directors were convinced, and the executive committee were convinced, that these people to whom refund was made had paid in the amount in excess of twenty-five percent innocently, and under a misapprehension of the requirements of the company. I learned that the men who had sold the stock had made representations to them in regard to how the balance over and above the twenty-five percent would become payable. Some of them were paying in fifteen percent a month, and others had been told that it would have to be paid in so many months, and they had never been advised to the contrary. It had usually been remitted by mail; and there was a distinction drawn as between people whom we had reason to believe had bought other people's subscriptions, speculators, and the original subscribers, and who were advised and had been required to pay the full amount, the full par value, into the company, in order to have transfers made. At that time, from the best information we had, there was plenty of assets of the company to take care of all such people, besides having ample to take care of all future obligations that might come up." About this time Albada, who had been appointed to audit the company's accounts, prepared a stock register, which the directors adopted. Thereon was a memorandum opposite each of plaintiffs' names, "Trans. from G. L. Dobson," but of this, prepared as it was by one in ignorance of the facts, it furnished no more than *prima facie* evidence, though the register be required by the laws of British Columbia to contain such data.

From this recital of facts, it seems very clear that the

directors, acting in harmony with the wishes of the stockholders, declined to accept more than twenty-five percent of the par value on original subscriptions. That they had the power so to do appears from the act of the Legislature of British Columbia, as well as the articles of incorporation; the latter furnishing the reason for the course pursued.

Upon the filing of a memorandum of association, accompanied by the articles, in compliance with said act, the subscribers thereto, together with such other persons as might, from time to time, become members of the company, became a body corporate capable of exercising corporate functions. It is expressly provided therein that nothing in the act shall "prevent any company incorporated under this act, if authorized by its regulations as originally framed, or as altered by special resolution, from doing any one or more of the following things, namely: . . . (2) Accepting from any member of the company who assents thereto the whole or part of the amount remaining unpaid on any share or shares held by him, either in discharge of the amount of a call payable in respect of any other share or shares held by him, or without any call having been made."

But this is merely permissive, and by the fifth article of incorporation it was provided that "the shares shall be under the control of the directors, who may allot or otherwise dispose of the same to such persons on such terms and conditions and at such times as the directors think fit." And the twenty-first article reads: "The directors may, if they think fit, receive from any member willing to advance the same all or any part of the money due upon shares held by him beyond the sums actually called for; and upon the money so paid in advance, or so much thereof as from time to time exceeds the amount of the calls then made upon the shares in respect of which such advance had been made, the company shall pay interest at such rate as

the members paying such sum in advance and the directors agree upon."

It was competent for the board of directors or the managing directors, acting as a committee in their stead (the articles so authorizing them), to direct that certificates be issued to original subscribers upon payment of twenty-five percent of their par value, and to determine whether the company should decline to receive more than that from subscribers willing to pay more, or receive the same and pay such interest as might be agreed upon. The board of directors very promptly, and long before any certificates of shares were issued to subscribers, declined to accept any in excess of the amount named by ordering that all in excess of twenty-five percent paid in by the original subscribers be returned to them. This was tantamount to accepting the twenty-five percent of the par value of all stock originally subscribed for and declining to accept any payments above or in excess of such percent, and this at the earliest opportunity after the complete organization of the company. Having declined to accept such payments, regardless of whether this was to avoid the interest charge, or for the reasons given by Mr. Crissman, to whom did such excess belong? Not to the company; for it had declined to accept it. It had been placed in the hands of Bliss, the secretary, through Mrs. Hamilton, and reached the treasury of the company for no other purpose than in payment of stock. Manifestly such excess, upon being declined by the company, should have been returned to the original subscribers, and the company became responsible therefor as for money had and received. On what theory it can be said to constitute a trust fund has not been quite satisfactorily explained. It was not acquired wrongfully, at least the record contains no charge of that kind. It reached the coffers of the company precisely as the original subscribers intended it should; and the only dereliction of the company, if any there was, lies in that it failed to pay back to each of these plaintiffs

the excess above twenty-five percent of the par value of the stock obtained by him, that is, conceding him to have been an original subscriber, as he might have been found.

It has seemed necessary to state the facts somewhat fully, and the conclusions mentioned, before taking up the questions on which this appeal must be disposed, which will appear after a recital of the allegations of the petition, as amended. The plaintiffs alleged the organization of the company, the taking of subscriptions of stock on payment of twenty-five percent of the par value; that each plaintiff subscribed for stock and made payments as stated; that the directors are engaged in settling the affairs of the company; that plaintiffs paid seventy-five percent on their stock more than other subscribers; that the company has refunded to other subscribers all paid in excess of twenty-five percent of the par value; that plaintiffs have joined in the action to avoid a multiplicity of suits, and have no plain, speedy, and adequate remedy at law; that, unless restrained, defendant will distribute the funds on hand and deprive plaintiffs of every part of the assets. The prayer was for a judgment in favor of each plaintiff separately for the excess over twenty-five percent of the par value by him paid, and that a temporary writ of injunction issue, restraining defendant from disposing of the funds on hand. The writ was issued as prayed; and in response to a motion for more specific statement an amendment to the petition was filed, alleging that the stock was procured through the secretary of the company, and that paid-up certificates of stock were issued to plaintiffs; and, further, "that the excess payments made by these plaintiffs over and above the twenty-five percent of their stock over and above what was paid by the other stockholders, is a trust fund in the hands of the board of directors, which they have no right to use for the purposes of the corporation, but that the board of directors have full power and authority to raise more money, if needed by a proper assessment upon all

stockholders of said corporation; and that, instead of using the money in their hands belonging to these plaintiffs for the purposes of the corporation, and for the purpose of conducting a large amount of litigation in which this company is engaged, the directors should be required to make an assessment upon the stockholders *pro rata* for such purpose, and for the further purpose of refunding to these plaintiffs the amounts which they have paid on their stock in excess of the amounts by them required to be paid by other stockholders. Wherefore plaintiffs pray as in their original petition, and that the directors be required and directed to make an assessment upon all of the stockholders of the company, for the purpose of raising a sufficient fund to pay the claims of these plaintiffs, if the funds which they now have on hand are insufficient to pay said claims of plaintiffs, and for such other and further relief as may be just and equitable in the premises." Before the filing of the amendment, defendants moved that the names of all plaintiffs, except John Miller, or such other plaintiff as they might elect to retain as plaintiff, be stricken from the petition, and also the allegations of the petition relative to the plaintiffs whose names shall be so stricken, for that the demands alleged and remedies prayed were not held by the same party, nor against the same party in the same right. Defendants also moved that the cause be transferred to the law side of the calendar. These motions were overruled, as also was a motion to dissolve the injunction. These rulings may be taken up in the order mentioned.

Our statute provides that "all parties having an interest in the subject of the action, and in obtaining the relief demanded, may join as plaintiffs except as otherwise provided." Section 3460, Code. A similar provision appears in the Codes of many of the states, and the better opinion seems to be that its design is to apply the rules which formerly obtained in chancery practice, with respect to parties plain-

1. PARTIES: misjoinder as plaintiffs.

tiff, to all actions. Pomeroy's Code Remedies, section
113; *Home Insurance Co. v. Gilman,* 112 Ind. 7 (13 N. E.
118); *Trompen v. Yates,* 66 Neb. 525 (92 N. W. 647).
The petition, as amended, does not bring the parties within
the letter or the spirit of this statute. The claims of these
plaintiffs may have grown out of the same transaction; but
no plaintiff is interested in the cause of action of another;
nor is any plaintiff interested in the relief demanded by
the others. That the claims are of the same nature and
the relief sought is of the same kind will not justify joining
in one suit. · The amount or kind of interest is not very
material. As laid down by Prof. Pomeroy (Remedies and
Remedial Rights, 199): "The extent of the interest is
not the criterion, nor the source nor origin. If the person
have any interest, whether complete or partial, whether
absolute or contingent, whether resulting in a common share
or the proceeds of the suit, or arising from the stipulations
of the agreement, the language applies without any limi-
tation or exception, and without any distinction suggested
between actions which are equitable and those which are
legal." *First Nat. Bank v. Hummel,* 14 Colo. 259 (23
Pac. 986, 8 L. R. A. 788, 20 Am. St. Rep. 257).

But, to justify joining parties as plaintiffs in an action,
there must be some community of interest in the particular
claim pressed for adjudication, and some common benefit
or advantage in the relief sought. As observed in *Martin
v. Davis,* 82 Ind. 38: "To entitle two or more persons to
join as plaintiffs, it is not sufficient that they each have a
cause for action arising out of the same transaction or mat-
ter, if the relief sought by each be distinct and unconnected.
The plaintiffs must have a common interest in the subject
of the action and in the relief. Each must be interested
in the relief sought by the other." The rule so clearly
stated was applied in *Bort v. Yaw,* 46 Iowa, 323, and
there is no decision in this state to the contrary. In *Rich-
man v. Board of Supervisors,* 70 Iowa, 627, the subject-

matters of litigation were the proceedings of the board of supervisors, and the remedy sought was a judgment declaring these void, and, as the several landowners were interested in both, they were held properly joined.

Other rulings wherein the levy of taxes or assessments have proceeded on the same theory, are *Brandirff v. Harrison County,* 50 Iowa, 164; *Watson v. Phelps,* 40 Iowa, 482; *Palo Alto Banking & Investment Co. v. Mahar,* 65 Iowa, 74.

The right of several creditors to join in an action to discover and subject property to the satisfaction of their claims is put on the same ground. *Gorrell v. Gates,* 79 Iowa, 632. See, also, *De Louis v. Meek,* 2 G. Greene, 55. In *Skiff v. Cross,* 21 Iowa, 459, sureties on an official bond, who together had paid a judgment against their principal, were held to have properly joined in an action to recover the amount so paid.

The rule is tersely stated in Cooper Eq. Pl. 182: "The court will not permit several plaintiffs to demand by one bill several matters perfectly distinct and unconnected against one defendant, nor one plaintiff to demand several matters of distinct natures against several defendants." *Faivre v. Gilliman,* 84 Iowa, 573; *Rhoads v. Booth,* 14 Iowa, 575; Cases collected in 30 Cyc. 114 and 15 Pl. & Pr. 731; *McIntosh v. Zaring,* 150 Ind. 301 (49 N. E. 164); *Keary v. Mutual Reserve Fund Life Ass'n* (C. C.) 30 Fed. 359; *Lewis v. Eshleman,* 57 Iowa, 633; *Utterback v. Meeker,* 16 Wash. 185 (47 Pac. 428); *Shull v. Barton,* 56 Neb., 716 (77 N. W. 132, 71 Am. St. Rep. 698). See *Tackaberry v. Sioux Service Co.,* 154 Iowa, 358.

The claims of the several plaintiffs were separate, distinct, and independent one from the other, and the relief sought was of the same character; and the court erred in overruling the motion to require plaintiffs to elect in the name of which the action be prosecuted, and to dismiss as to all others.

IV.   The only relief sought in the petition when the motion to transfer to the law side of the calendar, was ruled on, was a money judgment, and overruling the motion was error.   It is not contended, however, but that the amendment to the petition stated additional grounds for and demanded equitable relief.   If so, then the error was without prejudice; for, had the court sustained the motion, it would have been competent for it, on the motion of either party, or on its own, to have transferred the cause back to the equity side.   We are not saying that the petition, as amended, stated an equitable cause of action (that can only be determined when prosecuted); but, assuming that it did, as appellants appear to concede in argument, there was no prejudice in the court's ruling.

*2. ACTIONS: transfer of causes: harmless error.*

The recital of facts, nearly all of which were brought to the court's attention in support of or resistance to the motion to dissolve the temporary writ of injunction, quite clearly indicates that the moneys paid by the several plaintiffs did not constitute a trust fund in the hands of the company. If, as is contended, they were original subscribers, then, under the resolution of the directors, the last payment of seventy-five percent on their subscription was refused by the company; and if, instead of returning the same, it converted the money to its own use it became liable to them therefor. On no tenable theory can it be said that such conversion constituted it a trust fund. There was no evidence that it was kept apart from what belonged to the company; but, on the contrary it was mingled therewith and payment refused.   Whether by receiving fully paid certificates of stock the company elected to accept the last payment, and plaintiffs acquiesced therein, are matters to be determined later; the circumstances tending to repel these inferences.   See *Teeple v. Hawkeye Gold Dredging Co.*, 137 Iowa, 214.   Of course, a shareholder,

*3. CORPORATIONS: payment for stock: conversion: rights of stockholders.*

as such, is not a creditor (*Esgen v. Smith,* 113 Iowa, 28), and has no distinct right to any part of the corporate property. *Warfield v. Clark,* 118 Iowa, 69; *Stewart v. Pierce,* 116 Iowa, 733. But the corporation may become indebted to a stockholder precisely as to a stranger; and if it refuses to accept money tendered as subscription for stock, and converts the same to its own use, its liability therefor is precisely as though it had converted the property of a stranger.

The petition is without allegation that the corporation is insolvent. It may be that the funds on hand are likely to be paid for other purposes, than to satisfy plaintiffs'

4. SAME: rights of stockholders: injunction.

claims; but unpaid subscriptions constitute a trust fund for the benefit of creditors. *State Bank Bldg. Co. v. Pierce,* 92 Iowa, 668. And there is no suggestion but that these will be paid, if necessary, and that there will be ample funds to meet every obligation. This, as clearly appears from an examination of the petition and amendment, is not an action to wind up the affairs of the company. This must be done in the jurisdiction where the company was organized. 2 Cook, Corp. section 632. In any event, it could not be dissolved by a court of equity. *Wallace v. Pub. Co.,* 101 Iowa, 313.

The only relief to which any plaintiff, if successful, appears to have been entitled is a money judgment, and for this reason the court erred in not sustaining the motion to dissolve the temporary writ of injunction.—*Reversed.*

McCLAIN, C. J., and DEEMER, J., take no part.