INDEPENDENT VAN & STORAGE COMPANY, Appellee, v. IOWA MERCANTILE COMPANY, Appellee; F. H. KLUSS, Intervenor and Appellant.

CORPORATIONS: Subscriptions to Stock—Rescission for Fraud— Burden of Proof. A fraud-induced subscription for the stock of a corporation, due diligence being shown, may be rescinded, even *after* the corporation has become insolvent and has passed into the hands of a receiver, unless it is made to appear, by those opposing the rescission, that obligations have been created in reliance on such subscription, and that such obligations remain unpaid.

*Appeal from Linn District Court.*—MILO P. SMITH, Judge.

SEPTEMBER 17, 1918.

ACTION by a stockholder to rescind a subscription for stock, and recover notes delivered and money paid on the subscription. Decree in the court below dismissing plaintiff's petition. Plaintiff appeals.—*Reversed.*

*Redmond & Stewart,* for appellant.

*Crissman & Linville,* and *Powell & Robbins,* for appellees.

GAYNOR, J.—On the 10th day of July, 1916, defendant the Iowa Mercantile Company was a corporation and a going concern. On that day, one of its duly authorized agents solicited the intervenor, Kluss, to purchase stock in the company. In pursuance of the solicitation and representations and statements made by this agent, the intervenor made an application to the company for stock, in the following words and figures:

"Application for membership in Iowa Mercantile Company, Cedar Rapids, Iowa. Class B stock, $60.00. Class A stock, $30.00. Original, to be Filed at the Company's office.

"Date 7-10-1916.

"I hereby subscribe for five shares of Class B stock of the Iowa Mercantile Company, for which I agree to pay $300.00, as follows: $100.00 this day, and $200.00 October 20, 1916. Upon acceptance, this application becomes a contract equally binding upon both parties hereto.

"Name, F. H. Kluss.

"Address, Luzerne, Ia.

"Occupation, Farmer and Stock Buyer.

"This application written by J. M. Thomas.

"Accepted . . . . . . . . . . . Mgr. Stock Sales Department."

On the receipt of this application, the company issued to the intervenor five shares of Class B stock, upon receipt of which the intervenor executed and delivered to the company his two promissory notes of $100 each, and paid to

the company $100 in cash, as stipulated in the contract. On the 7th day of September following, the Mercantile Company being insolvent, a receiver was appointed, to take charge of its affairs. We take it that the receiver was appointed in the suit instituted by the Independent Van & Storage Company against the Mercantile Company. After the receiver had been appointed, and on the 13th day of October, 1916, Kluss intervened in said action. In his petition of intervention, he alleges: That he was induced to subscribe for the stock through the fraudulent representations of the agent of the Mercantile Company; that the agent represented that the company was prospering, and in a thriving condition, and that, during the month of June, 1916, its earnings, above and over all expenses, were in the sum of approximately 20 per cent of the capital stock; that it had existing contracts with western fruit dealers, and had plans under way whereby storage facilities were to be had, to take advantage of its contracts with western fruit dealers; that it would be able to handle western fruit at a great profit and advantage to its stockholders, and that it could and would sell to its stockholders coal and flour and other staple merchandise for less money than said merchandise could be obtained elsewhere. The intervenor alleged that these representations were all false and were known to be false; that he believed them to be true, relied upon them, and was induced to purchase the stock, pay his money, and execute the notes in controversy. He further alleged, in an amendment to his petition, filed October 25th, that the notes and money are now in the hands of the receiver of the company; that he promptly and diligently, upon learning of the false and fraudulent representations, rescinded said transaction, by filing his petition of intervention herein; that he brings and tenders the stock certificate for cancellation. Intervenor further says that no rights of bona-fide creditors have supervened, nor had any

credit been extended on account of said subscription, nor on account of the money and notes received by the Mercantile Company from this intervenor.

To this petition, the receiver, in answer, said: That he admits the insolvency of the company, as pleaded; admits that he is in possession of the notes in controversy, amounting to $200, and that the notes were given in pursuance of the written subscription of the intervenor for capital stock; denies that no rights of bona-fide creditors have accrued since the making of said note; and denies that no credits have been extended on account of said note and the subscription for said stock; and alleges that the intervenor is not entitled to the relief demanded.

On the 5th day of May, 1917, the said cause coming on for hearing on the petition of intervention, and the parties appearing by their respective counsel, there was filed in said cause the following agreed statement of facts:

(1) That, in soliciting the intervenor to subscribe for stock in the Iowa Mercantile Company, the agent of said company made representations as to the conditions and property rights of said company, untrue and false in fact.

(2) That said representations were made with the purpose and intent of inducing the intervenor to subscribe for stock and to give his promissory notes therefor, aggregating $200, and $100 in cash.

(3) That the intervenor was induced by said false representations to make the subscription made, believing said false representations to be true.

(4) That said representations were made, the subscription entered into, and the notes and cash delivered on the 10th day of July, 1916, and application was made for appointment of a receiver for said company, and receiver appointed on the 7th day of September, 1916.

(5) That the two promissory notes given by the intervenor in subscription for stock in said company, for the sum

of $100 each, are now, and have been at all times hitherto, in the hands of the receiver.

(6) That the petition of intervention of intervenor was filed herein and notice given on or about the 25th day of October, 1916, asking the relief of rescission of his subscription and cancellation of said notes, and return of the $100 ·cash payment.

(7) That the character and effect of the false representations were such that, in law, they would furnish the basis and warrant judgment and decree of a court of equity, adjudging rescission of the subscription and cancellation of the promissory notes and the return of the cash payment, if action therefor had been instituted against Iowa Mercantile Company before and prior to the application for and the appointment of the receiver.

(8) That the foregoing facts are submitted for judgment of law applicable thereto.

No further evidence was introduced. Thereupon, the case was submitted to the court, and judgment entered dismissing plaintiff's petition.

Upon the record thus made, it is apparent that, if intervenor's suit was prosecuted against the Mercantile Company, he would be entitled to the relief prayed for. If the interests of the Mercantile Company alone were involved, the relief prayed for could readily be given. The record shows, however, that the Mercantile Company is a corporation; that it is insolvent and in the hands of a receiver; that the suit by this intervenor was not commenced, nor was any action taken to rescind and to recover back the property in controversy, until after the affairs of the company had passed into the hands of the receiver.

A stockholder sustains a threefold relation: (1) to the corporation as a legal entity; (2) to his fellow stockholders; (3) to the creditors of the corporation. The capital is supplied, not by the artificial entity known as the corporation, but by its stockholders. This capital is supplied

for the purpose of carrying on the enterprise, and is a fund to which the creditors of a corporation have a right to resort; and, while it exists, affords them protection in extending credit to the corporation. The artificial entity exists mainly for the benefit of, and is governed and controlled by, the stockholders, through officers elected by them. The legal control of any stockholder is measured by the number of shares of stock held by him, representing, as it does, the amount contributed by him to the capital stock of the company. If any unpaid stock is issued, the holder of the stock is liable to the company for the amount of the unpaid balance, and this liability is an asset in the hands of the corporation, and is an asset to which creditors may look for the satisfaction of their claims against the corporation. When liability has been assumed by a shareholder to a corporation for stock delivered, that liability is an asset in the hands of the corporation, and may be sold or assigned like any other chose in action, and, upon a general assignment for the benefit of creditors, passes to the assignee, like any other chose in action held by the corporation. It is subject to attachment by creditors of the corporation, and may be reached by attachment process, to the same extent as other claims belonging to the corporation. It follows, therefore, that it is an asset that passes to the receiver upon his appointment,—an asset held by the receiver for the benefit of creditors of the defunct concern.

When a corporation becomes insolvent, and action is begun to wind up its affairs, its entire property, including unpaid subscriptions to its capital stock, passes to the receiver, and becomes a fund for the payment of its debts. The so-called English, or trust, doctrine can be invoked only when the corporation has become insolvent, and passes into the hands of the receiver for the winding up of its affairs. While it remains a going concern, and has possession and management of its property, its creditors sustain the same relationship to its assets as do the creditors of

individuals. If one is induced to purchase stock in a corporation through fraud practiced upon him, he may rescind the contract of purchase and recover what he has paid, upon the same showing that would be required of him in the purchase of property from an individual. His rights would not be changed by the corporate character of the other contracting party. If he has become a stockholder, and is holding stock with unpaid subscription, he is a debtor to the corporation to the extent of the unpaid subscription. This debt is as much a fund to which creditors have a right to look, and is just as much an asset for the benefit of the creditors, as any of the tangible property of the corporation. Upon insolvency, the receiver takes this obligation as an asset for the benefit of creditors. The receiver represents the creditors and the stockholders. In *Sanger v. Upton*, 91 U. S. 56, 60, it was said:

"The capital stock of an incorporated company is a fund set apart for the payment of its debts. * * * It is publicly pledged to those who deal with the corporation for their security. Unpaid stock is as much a part of this pledge, and as much a part of the assets of the company, as the cash which has been paid in upon it."

It has been said that one of the objects of fixing the capital of a corporation by its charter at a definite amount is to provide a fund to pay the company's legal obligations, and to secure those who may give it credit. In England, because of peculiar statutory enactment, the courts generally hold that, after insolvency, and after proceedings have been instituted to wind up the affairs of a corporation, and a receiver has been appointed, all the assets of the defunct corporation become a trust fund in the hands of a receiver for the benefit of all the creditors; and that, though the right of a defrauded stockholder to rescind his contract of subscription and recover what he has paid, existed in its full force before the institution of the proceed-

ings to wind up the affairs of the corporation, yet, unless he took steps to rescind his contract and recover his money before the proceedings in insolvency were instituted, he was remediless. He had pledged it to the corporation for the benefit of its creditors; and, after insolvency and proceedings in insolvency had been instituted, the equities of creditors became greater than the equities of the defrauded subscriber. Equity, therefore, as against the creditors, gave him no relief. The doctrine has not been adopted in its fullness in this country. Upon that proposition, courts have divided, some of them holding that, if the fraud was clearly proven, and he was not guilty of any laches in discovering the fraud, and acted promptly upon discovering the fraud, equity would not deny him the right to rescind and recover that of which he had been defrauded. This is surely equitable and just, when it is not made to appear that there are claims to be satisfied, out of the assets of the company, that came into existence in reliance upon this as an asset.

We gather, from this record, that the plaintiff in this suit, the Independent Van & Storage Company, commenced an action on account against the Iowa Mercantile Company. The time when this suit was commenced does not definitely appear. Certain of the stockholders of the Mercantile Company appeared in that suit, and, on the 7th day of September, 1916, filed a petition, alleging, among other things, that the defendant company was organized on May 1, 1915; that its officers were grossly mismanaging the company; that the defendant was insolvent; that it was owing creditors about $58,000 for merchandise. On the same day, the receiver was appointed, and, on the 9th of October, 1916, he made application for an order, stating that, in his opinion, the affairs of the company should be wound up as speedily as circumstances would permit; that many of the assets of the company in the hands of the receiver and un-

disposed of, are groceries and meats; that numerous notes given for the stock of said company are long past due and unpaid; and asking, among other things, that he be directed and authorized and empowered to collect the notes in his hands, either with or without suit. On the same day, the court made an order that he collect the notes and accounts of the Iowa Mercantile Company, either by suit or otherwise, as it may seem to him advisable, and that the affairs of the company be wound up with such reasonable speed as circumstances would permit. On the 13th of October, this intervenor filed his petition hereinbefore referred to.

The facts supporting intervenor's contention are found in the record as follows:

(1) On the 10th day of July, 1916, the intervenor was induced to subscribe for certain stock in the defendant company, by reason of false and fraudulent representations made by the agent of the company which were sufficient to warrant a court of equity in rescinding the contract of subscription, cancelling the notes, and directing the return of the money paid upon the subscription.

(2) That certificates of stock were issued to the intervenor, in pursuance of his application.

(3) Some time after that—the date of which does not appear—the Independent Van & Storage Company commenced an action against the Mercantile Company.

(4) On September 7, 1916, seven of the stockholders of the Mercantile Company appeared in that action, and alleged that the company was being mismanaged by its officers, and was insolvent, and was largely indebted for merchandise, and prayed for the appointment of a receiver.

(5) A receiver was then appointed, who took charge of the assets of the company.

(6) Thereafter, on the 9th day of October, the receiver made an application to wind up the affairs of the company, and on the same day, an order was made to that effect.

(7) On the 13th of October following, this intervenor filed his petition asking his subscription for stock cancelled, offering to return the certificate of stock, and praying for an order on the receiver to return to him the notes and money given as a consideration for the stock.

There is no affirmative showing as to when the plaintiff discovered the fraud upon which he predicated his right to rescind this contract. There is no express showing as to what diligence he exercised in an effort to discover the fraud. There is no showing whether or not the indebtedness against the corporation, or any of it, accrued before or after plaintiff's subscription. There is no proof—no showing made—as to when the company became insolvent. The only statement is that it was insolvent on the 7th day of September, 1916. There is no showing as to its available assets or liabilities. The English rule is discussed by Justice Ladd in *Hinkley v. Sac Oil & P. L. Co.*, 132 Iowa 396. Upon a careless reading, it would seem to be approved; but in that case the rescission was made before the proceedings had been commenced to wind up the affairs of the corporation, for it is said:

"Nor does it appear that any proceedings in insolvency had been commenced, or that it had committed any act of insolvency."

It did not, in that case, even appear when the company became insolvent. The rule was recognized that, if the defrauded stockholder is diligent in discovering and repudiating the fraud, insolvency will not defeat his right to rescind. The English rule is also discussed in *Johnson v. Morgan*, 178 Iowa 577. The right to rescind, upon a showing of diligence to discover the fraud and repudiate the contract, was recognized.

The time intervening between the subscription and the filing of the petition for the appointment of receiver was less than 60 days. The character of the deceit practiced

upon plaintiff to induce him to take the stock would have the effect of lulling the ordinary man's mind into a feeling of security. There was nothing to suggest inquiry. Within less than five weeks after the filing of the petition for the appointment of a receiver, the intervenor filed his petition to rescind and recover. To defeat plaintiff, we must be able to say, from this record, that he was lacking in diligence, from the mere fact that he did not discover the fraud and repudiate his contract sooner. We must be able to say that there are claims in the hands of the receiver to be satisfied out of the assets that accrued after the plaintiff had obligated himself as a stockholder. The only reason why equity should estop the plaintiff from recovering the notes and money out of which he had been defrauded, is that the rights of innocent persons have intervened, and that it would be inequitable against them to allow him to withdraw from the receiver the property received by the company, though fraudulently received. The theory upon which the equitable rule rests, is that, where one of two innocent persons must suffer, the one who created the condition which led the other to his harm, must suffer. So it follows that, if the plaintiff acted diligently in discovering the fraud and repudiating the obligation as soon as the fraud was discovered, he certainly has been guilty of no wrong. Unless it affirmatively appears that he was guilty of legal wrong, there is no principle of equity that will estop him from asserting his right. As between him and the corporation, he had a right to retire from the contract because it was fraudulently obtained. He had a right to retire, upon returning, or offering to return, what he had received. The record does not even suggest a lack of diligence, either in discovering the fraud or repudiating the contract; and there is no showing that anyone has been misled.

It may be claimed that the burden was on the intervenor to show that there are no creditors whose claims ac-

crued after he had pledged himself as a stockholder; but
we think that, in a case such as we have here, where it af-
firmatively appears that the plaintiff has done no wrong,
and is insisting only on what is his legal right, he should
not be defeated except upon a showing that some innocent
person will suffer by a recognition of his right.

Upon the whole record, we think the court erred in dis-
missing plaintiff's petition, and that the plaintiff is en-
titled to the relief prayed for under this record; and the
cause is reversed, with direction to enter decree as herein
indicated; or, on the election of intervenor, a decree may be
entered in this court.—*Reversed.*

PRESTON, C. J., WEAVER and STEVENS, JJ., concur.