M. E. SHERMAN, Appellant, v. J. C. SMITH et al., Appellees.

**CORPORATIONS: Stock Issued for Other than Money.** Stock issued for property other than money, and without permission of the executive council, is not absolutely null and void, but voidable only. (See Sec. 1641-b, Code Supp., 1913.)

**WORDS AND PHRASES: "Void" and "Voidable."** The word "void," when used to secure a right to, or to confer a benefit on, the *public*, will, as a general rule, be construed as implying a declaration of absolute nullity; when used with respect to the rights of *private individuals*, it will be construed, as a general rule, as implying voidability only.

**PRINCIPAL AND SURETY: Judgment Against Principal Binding on Surety.** An unappealed judgment against a principal, on his defensive plea of want of consideration and unauthorized material alteration, *is conclusive on the codefendant surety.*

**FRAUD: Fact and Opinion.** Representations that a company had built up a good business and was making money are, if knowingly false, actionable; otherwise as to a representation that a purchaser would be able, in a short time, to pay for the business out of the profits.

**PRINCIPAL AND SURETY: Concealment of Material Facts.** Principle recognized that sureties are released by the fraudulent concealment, on the part of the one taking the guaranty, of facts which *increase the risk* of the surety, and induce him to enter into the contract under a false understanding of the facts.

**PRINCIPAL AND SURETY: Non-Material Concealment.** The *fraudulent* concealment of the fact that an incorporated drug company,—the sale of the corporate stock of which was the

subject-matter of the suretyship,—was, at the time of the sale, defendant in an undetermined action for injunction against the *unlawful* sale of intoxicating liquors, is not such *material* concealment as will release the surety.

*Appeal from Calhoun District Court.*—F. M. POWERS, Judge.

OCTOBER 25, 1918.

REHEARING DENIED MARCH 12, 1919.

JUDGMENT on promissory notes went against defendant J. C. Smith, despite defense by him and his codefendants, his sureties, that no valid consideration supports the notes, and that they had been materially altered. From this judgment, no appeal has been taken. A further defense was that the notes were obtained by fraudulent representations. The sureties were released. Hence, plaintiff appeals.—*Reversed.*

*Hume & Bradshaw,* for appellant.

*O. C. Brown,* for appellee.

SALINGER, J.—The statute requires a permission from the executive council if it be proposed to issue stock shares for something other than cash. It attaches certain conse-

1. CORPORATIONS : quences for so selling without such permis-
stock issued for sion, and affixes a penalty where corpora-
other than
money. tion officers make false certificates. Chapter 104, Section 4, Acts of the Thirty-third General Assembly (Section 1641-d, Code Supplement, 1913) ; Sections 1641-b, 1641-e, 1641-f, Code Supplement, 1913. Plaintiff filed a certificate which stated falsely that stock had been paid for in money. No permission was had to issue for anything but money. Shares of this stock are the sole consideration for plaintiff's notes. And appellees assert that, because of the statute violations aforesaid, said shares are abso-

lutely null and void, and that, therefore, the notes are wholly unsupported by any consideration.

This argument necessitates a fuller analysis of the statute, or rather, of its penalties. The said act of the thirty-third general assembly provides that the capital stock of any corporation issued in violation of the terms and provisions of statutes on this matter shall be void, and that, in suit brought by the attorney general on behalf of the state, a decree of cancellation shall be entered; and, if the corporation has received any money or thing of value for the stock, same shall be returned to the one from whom it was received. Section 1641-e is that any corporation violating the provisions of the chapter shall, on application of the attorney general, on behalf of the state, be dissolved, its affairs wound up, and its assets distributed among the guiltless stockholders; Section 1641-f, that any representative of a corporation, or any officer or agent thereof, who violates any of the provisions of the chapter, shall, on conviction, suffer fine or imprisonment.

We are of opinion that, when the statutes are read together, as they should be, it was not the legislative intention to make stock issued under the conditions at bar *ipso facto* void, but to make violations of this chapter a cause for having the stock cancelled at the suit of the attorney general, and to inflict other punishments for the violation, which, however, do not include that the stock issue shall be void, instead of voidable. The failure to have the approval of the executive council has been dealt with in this court, and it was held, in *First Nat. Bank v. Fulton*, 156 Iowa 734, that the clear purpose of the particular statute provision dealing with this point was "to protect the corporation, as such, against the issue of its corporate stock in payment for property or services or other things at fictitious value." And it is expressly ruled that a note given

for corporate stock issued in violation of this provision may be collected. We have not had occasion to deal with the other violation—the false certificate. But in the law gen-

2. WORDS AND
PHRASES:
"void" and
"voidable."

erally, the words "void" and "voidable" are frequently used by legislatures interchangeably; and where the word "void" is used to secure a right to or confer a benefit on the public, it will, as a rule, be held to mean null and incapable of confirmation; but, if used respecting the rights of individuals capable of protecting themselves, it will often be held to mean voidable. See *Van Shaack v. Robbins,* 36 Iowa 201, and cases cited; and numerous authorities to like effect may be found in our own reports,—more, that so hold as to clauses in insurance policies which provide for their becoming void upon certain contingencies. In *Toledo, St. L. & K. C. R. Co. v. Continental Trust Co.,* 95 Fed. 497, the court construed a statute that all stock, bonds, or securities of a railroad company purchased of the company by a director thereof for less than par value should be null and void, and held that, because the purpose of the statute was the protection of the corporation, the word "void" should be construed to mean "voidable." In *Matter of New York & L. I. Bridge Co. v. Smith,* 148 N. Y. 540 (42 N. E. 1088), an act incorporating a bridge company provided that the construction of a certain bridge should be begun within two years and be continued without unreasonable delay until completed, and that otherwise, the act and all rights and privileges granted thereby "shall be null and void." It was held that "null and void" here meant voidable. Against this, we are cited to 7 Cyc. 745, which is, "Commercial paper cannot be based on any consideration which is a violation of an express statutory provision." This does not quite meet the situation. The consideration here was shares of stock. They had infirmities for which they might, on proper action by the attorney general, have been cancelled, and, after be-

ing cancelled, they would have furnished no consideration.
But, while the shares were issued without complying with
all statute directions on the subject, they were still shares
of stock whose validity might never be attacked by the au-
thorities of the state. The shares themselves were not a
violation of law, say, like larceny. To illustrate, a note
given for the transfer of a note whose consideration was
furnishing game killed in violation of the game laws would
not fail of consideration on the ground that the note trans-
ferred was itself a transgression of the statute. The maker
might choose to pay it. On the other hand, a note given for
services in killing game in defiance of the game law would
be vulnerable to a plea of want of consideration; for the
very plea would be a tenable resistance to paying. On the
whole, we are inclined to hold that consideration for the
notes in suit is not lacking because some statute provisions
were disregarded or violated in the issuance of the stock.

### 1-a

Be that as it may, the trial court gave the plaintiff
judgment on the note against the principal debtor, Smith.
From this action no one has appealed, and all that this ac-

3. PRINCIPAL AND
SURETY: judg-
ment against
principal bind-
ing on surety.

tion necessarily involves is the law of the
case, though the case is reviewable here
*de novo*. *Babcock v. City of Des Moines,*
180 Iowa 1120. As to Smith, then, it is settled that the
stock furnished a sufficient consideration. But it appears
clearly, Smith was *particeps criminis,* and the judgment
against him might rest on that fact, and, therefore, be not
necessarily a finding that the stock was good consideration,
despite the law violations involved in its issuance. But
there are at least two reasons why this will not avail the
appellees: While, because Smith was *particeps criminis,* he
can have no *affirmative* relief by asserting his own wrong, if
the stock was void for criminality Smith could success-
fully *defend* against a note based on such stock only, *and*

*have purely defensive relief,* even though he participated in
the crime. Therefore, a judgment against Smith on the note
is, of necessity, a finding binding. on all parties before the
court that the stock constitutes a valid consideration, even
though they were not adversative, and were on the same
side. *Smith v. Cretors,* 181 Iowa 189, and cases cited.
Second, if, by reason of estoppel or any other reason, it
was bindingly adjudicated that Smith must pay the notes,
it follows that, though the judgment rest upon the inability
of Smith to urge certain defenses, that, if he must pay,
the sureties must pay.

It is true that, in the sense of receiving something for
themselves, there was no consideration as to the sureties,
no matter how much consideration there was as to the
principal.   But that is equally true whether the stock in
question was void or not void.   The sureties were not to
receive and did not receive any of the stock, whether void
or valid.   But at this point the consideration to the sureties
is what it always is:   First, what the principal received;
second, the detriment to the payee in having relied upon
the undertaking of sureties, and then having the surety
fail to respond to his undertaking.

### 1-b

The plea of material alteration is, of necessity, in the
same case.  If there was a material alteration of the instru-
ment, there should have been no judgment against Smith.
There was, and it is not appealed from.   What has been
said as to the validity of the stock as a consideration ap-
plies fully to this situation.   Moreover, the alleged alteration
was made at the request of Brown.

II.   Now, it is defended that the notes were obtained
by fraudulent representations.   Of course, as to Smith, the
judgment against him settles that this defense is not sus-
tained.   But it does not necessarily dispose of the defense
by the sureties.   Unlike said defense of want of considera-

tion and of material alteration, the sureties here may defend with the alleged fraud, even if their principal may not, because the claim is that the signing by the sureties was obtained by fraudulent representations made to them. If that be a tenable claim, it is a complete defense, even though no false representations were made to the principal.

The court discharged the surety Gertrude Smith. This action cannot be sustained, on the evidence. All that appellee says on the subject is, "It is unnecessary to devote space to discuss the case against Gertrude H. Smith. The statute referred to in our brief settles that." We take it this is a reference to the statutes dealing with the issuance of stock. Of this defense we have disposed. As to false representation, there is absolutely no testimony that any representation whatsoever was made to Gertrude H. Smith, or that she relied on any. The record contains scarcely more than an occasional casual mentioning of her name. It was error not to enter judgment against her, as well as against her principal, Smith.

III. It is claimed Smith made certain false representations to Brown at the request of Sherman. This is denied, and appellant contends further that they were but the expression of an opinion. We need not settle the dispute over this, because it is conclusively made to appear that Brown refused to act on these alleged representations of Smith's, and did not rely on them. All that was relied on, if anything was, are alleged false representations made by Sherman after Brown refused to act on what it is claimed Smith said. And we address ourselves to the conduct of Sherman.

### 3-a

The definite allegations in pleading are that Sherman fraudulently represented:

(a) That the drug company was doing a good business; (b) that it was making money; (c) that Smith had

built up a fine business, and was doing well therein; (d)
that the business was such that Smith would
be able to meet the payments on the notes
in suit as such payments fell due. It is pleaded these rep-
resentations were false and fraudulent, because Sherman
knew and did not reveal, and Brown did not know: (a)
That the drug company whose shares were sold to Smith
for the notes in suit had been doing business at a loss for
more than six months before Brown signed them; (b) that
the company was largely in debt, and had been obliged to
borrow, to pay its debts and running expenses; (c) that
its taxes remained unpaid.

4. FRAUD: fact and opinion.

We have first to say that the alleged false representa-
tions are not nonactionable opinions. Assume one knows
that a concern has, for six months, been doing business at
a loss; that it is largely in debt, has been compelled to
borrow to meet debts and running expenses, and has de-
linquent taxes: and he is guilty of a fraudulent and ac-
tionable misrepresentation in saying that the concern is
doing a good business, and that a fine business has been
built up and the builder was doing well therein and is
making money.

As to the alleged representation that the business was
such as that Smith would be able to meet the installments
on the notes as same fell due, we think that is the state-
ment of a nonactionable opinion, because it declares a de-
duction as to the future. Brown testifies, on cross-examina-
tion, that Sherman used the words "in my judgment," in
saying that Smith would pay out. And it has bearing that
Smith did pay fourteen $100 installments out of the busi-
ness. And it is doubtful whether there was any reliance;
for Brown testifies he said he (Brown) could not see how
a business incorporated for $5,000 could maintain itself,
pay clerk hire, rent, taxes, insurance, support Smith and
his family, and pay $100 a month.

IV. This brings us to the evidence on the question whether what is said to be, is false, and, if so, whether the false matter was fraudulently uttered.

Is it proved the business was operated at a loss for six months before Brown signed, or; if it was, that plaintiff knew it when he stated what is charged? Consideration of the true condition comes first. If it be not shown that a falsehood was told about it, there is no room for inquiring into *scienter*. What is the evidence for the claim that the business was operated at a loss for more than six months before Brown signed? The consideration of the question resolves itself into settling a conflict between Smith and Sherman, and between Smith and matters that are either undisputed or conclusively established. There is nothing in the record that impeaches Sherman. On the contrary, it is not easy to understand what motive he could have for making fraudulent representations to obtain the signature of sureties. Even if the drug stock was below par, and the business unprofitable, without sureties, Sherman had ample security given him by Smith, and surrendered Smith's securities to him after the signing of the notes by defendant sureties. In these circumstances, Smith's testimony might naturally be colored by a desire to let Sherman have nothing but the note of Smith, which does not appear to be valuable, and to obtain the release of Smith's wife and his father-in-law. And the credibility of Smith's testimony is otherwise affected. Time and again, he squarely contradicted himself, and had to retract on material matters, either through the stress of cross-examination, the production of his own letters, or of indubitable other evidence. These instances are too numerous to be detailed without unduly extending this opinion. A few, however, are illustrative. He testifies repeatedly that an injunction granted in December, 1908, prevented him from selling liquor, and that, after its issuance, he sold no liquor,—and this though

the injunction, of course, was directed to illegal sales only. On cross-examination, he admits his permit was not taken from him, and that he continued selling liquor until the summer of 1909. To support the theory that there were debts of which Sherman knew, he testifies he had advised Sherman of them by letter. He testifies later that he never reported these items to Sherman in any manner. He is constant in attempts to swell the indebtedness. He states the debts of the drug company were between $2,000 and $2,200, when the incorporation took place. On cross-examination, he says they were $1,650. About that time, he reported to Sherman that the total indebtedness outstanding was $161.92, including "outstanding cigar bills of $130, the sale of which are guaranteed:" i. e., a conditional debt, with right to return. After the incorporation, he wrote Sherman that all the bills excepting $1,000 to the Des Moines Drug Company were old bills, coming due in March, 1908, and he was glad to say "they are practically all paid up now." At the time when Sherman sold out to Smith, the actual indebtedness consisted of three items, aggregating $93.45, which Smith attempted to raise to $180.01, admitting, on cross-examination, that at least three of the items put in by him were not incurred until about seven months after Brown signed. He reported one of the items as being $102. He testifies it was $76. Defendants pleaded the indebtedness was $2,300. Smith testifies that, at the time of the incorporation, the inventory came to $3,000. He advised Sherman that he was carrying $3,000 insurance and needed $500 more, and after he bought Sherman's stock, he was still carrying $3,500 insurance.

4-a

Is the statement that the business was a good one proved a false one?

Notwithstanding the testimony of Smith to the contrary, it appears, by the evidence of the record of sales,

that the month of May, 1908, is about an average one for the summer of that year, and is a good month. In that month, the sales came to $588.05. The June sales fell some $50 short of this; September and October sales were, respectively, $739.75 and $801.82,—higher than the sales in May. The record demonstrates that, in the main, the business of 1908 was as good as it had been in the three years in which its profits paid in full the original cost of the store, $3,721.60, its maintenance and operation, and the maintenance of Smith. Smith testifies the business "began" to fall off after the notes were signed. On February 29, 1908, he wrote that payments to Sherman and extra efforts to clean up small bills had reduced their bank account to $64, but that, as business was holding up in good shape, he soon hopes to increase the deposit sufficiently to clean up what was owing the Des Moines Drug Company, and at an early date; on March 16, 1908, that business was extremely quiet just then, but that he had hopes of its being better as soon as weather and roads became settled; on July 7, 1908, that "the sales show quite an increase, and hope to make a better showing this month." Two days later, he wrote that crop prospects were very promising, and that he looked forward to a good fall. On August 10th, he wrote that everything was moving along nicely, and that he expected "an excellent fall trade;" on September 2, 1908, "I am enjoying very good business this week." About six weeks before the notes were signed, on October 11, 1908, he wrote:

"You will note quite an increase in sales, which increase I hope to keep up; also the collection of accounts I have every reason to believe will become very satisfactory, so we may look for something in the shape of dividends before many weeks."

Smith was buying this drug store at the very time the notes were being signed; knew all about it; and thought

it worth buying at a large price. Three months after the notes were signed, the sales ran substantially to those of May, 1908, which, as said, is shown to be an average good month. After the notes were signed, the store enabled Smith to live and to make 14 monthly payments, of $100 each. As late as May 3, 1910, when advised that Smith was delinquent, Brown wrote Sherman: "I have understood that he was doing a splendid business until the last few months."

It is true that, during several months of the year 1908, Sherman was not satisfied that the business was being kept up to the proper pitch, during some of the months. It should be remembered these letters were written in comment upon statements of Smith to which we have before adverted. Sherman states his views thus:

"So far as I am able to learn, the business had not, in the three years Smith was at Lohrville, suffered any loss of volume of business to any extent, though there might have been a month here and there which was less or more."

Whatever the effect of these facts may be upon *scienter*, they give no support to the substantive charge that the representations made by Sherman were, in fact, false. It has no tendency to prove that the business was in a ruinous condition because Sherman, on receiving optimistic opinions and reports from Smith, felt moved to say that he was, for the time being, not satisfied, and urged Smith to increase the volume of sales. Had the business, in fact, been losing ground, and unprofitable, these letters from Sherman would bear on his knowing this to be so. But, where the evidence shows the business was, in fact, not suffering, complaints by Sherman and his urging an increase of sales do not prove that the business was not prosperous.

4-b

It is elementary that fraudulent concealments on ma-

terial matters are equivalent to affirming a fact which does

5. PRINCIPAL AND
SURETY: con-
cealment of
material facts.

not exist. Story on Equity Jurisprudence, Section 215; 2 Kent's Commentaries *483; Stearns on Suretyship, Section 106. And the doctrine applies quite strictly in favor of sureties.

"Thus, if a party taking a guaranty from a surety conceals from him facts which go to increase his risk, and suffers him to enter into the contract under false impressions *as to the real state of the facts,* such a concealment will amount to a fraud, because the party is bound to make the disclosure, and the omission to make it *under such circumstances* is equivalent to an affirmation that the facts do not exist." Story on Equity Jurisprudence (12th Ed.), Section 215. See *Burks v. Wonterlin,* 6 Bush (Ky.) 20, 22.

There are a good many things that operate to release a surety; and the six Iowa cases cited for appellee release sureties. The difficulty is that the citations are irrelevant. They have no bearing on whether anything in this record works a release. Let us take up some of the alleged concealments,—all but one of them, which will be considered separately.

It is complained Sherman said the book accounts were worth $1,000, and did not inform they were worth not over $400; that he did not tell that the tangible assets consisted of much old, rundown stock, bought of a former owner, and that it would not invoice as much as $2,500. We think the pleadings do not seek relief because of such concealment, and that there is no evidence the book accounts were not worth more than $400, or that the stock of goods was in said condition.

The next complaint is, Sherman did not tell of letters which complained of the business falling off from July to October, 1908. This alleged concealment, too, is not relied on in pleading. At any rate, the sole materiality of such complaint by Sherman is that it bears on *scienter,*

and their effect on establishing *scienter* is considered else-where in this opinion.

### 4-c

To be sure, Sherman testified that no mention was made of any debt owing to the Des Moines Drug Company. Some nine months before the notes were signed, there was a debt due that concern; but, at that time, Smith wrote Sherman an argument in support of Smith's hope that he would soon clean up this debt. Moreover, Sherman had assumed this debt. It is presumed he is solvent, and the record indicates affirmatively that he is. For all practical purposes, this item had ceased to be anything that the Lohrville Drug Company would be called upon to pay.

### 4-d

Appellees say Sherman admits he did not inform Brown of a debt owing the Lohrville bank. This is not very ma-terial, unless it appears that there was a debt due that bank, and that Sherman had knowledge of it. It does ap-pear that, in February, 1908, the drug company owed two notes aggregating $450. It does not appear that they were owing to the Lohrville bank. On the contrary, Smith wrote what would tend to make Sherman believe there was no indebtedness to said bank; for, on February 29, 1908, he wrote that the balance at the bank was $64, and that he hoped soon to increase it materially, and he made no men-tion of any indebtedness owing the bank. The natural construction of it was to take it as an assurance that, while the debt was small, it was the bank that was the debtor.

### 4-e

We cannot trace the statement of Smith that, in Febru-ary, 1908, there were two notes aggregating $450, beyond one note which he claimed was a note for $200, and which, the evidence shows, was for $174.58. But this note was made before the corporation was formed, and was not its debt at all, when the notes in suit were signed. Moreover,

it gives very little support to an allegation that material indebtedness was fraudulently concealed, to show that, some nine months before the notes were signed, the drug company owed $450 in notes.

4-f

It is not so material that Sherman says he did not inform of "the other debts," as is the question what other debts there were to inform of. At the time of the sale, and before the notes were signed, Sherman had, in effect, relieved the corporation of the debt of something like $1,000 due the Des Moines Drug Company. Eliminating this, and certain goods held virtually on commission, and with the right of return, the debts of the corporation, at the time the notes were signed, consisted of $56.83, due the Western Bottle Manufacturing Company, $4.80, due the Continental Compound Company, and $31.82 due the W. L. Yetter Company,—a total of $93.45. Some 18 days before the notes were signed, Sherman had written Smith to reduce indebtedness materially within 30 days. It is elementary that neither misrepresentation as to or concealment of an immaterial matter will release the surety. It is said, in *Comstock v. Gage,* 91 Ill. 328, at 336, that, in order that failure to communicate a fact to a surety should have the effect of a fraud, "it must be a fact which necessarily must have the effect of increasing the responsibility of the surety, or operating to the prejudice of his interest." It must be a material or inducing concealment. *Security Sav. Bank v. Smith,* 144 Iowa 203, at 210. Even if we assume, upon the testimony of Smith, that Sherman said to Brown there was *no* indebtedness, the fact remains that the indebtedness was, as to a business of the size of this drug store, trifling. In *Chace v. Brooks,* 5 Cush. (Mass.) 43, it was held that the accidental omission of a small amount of indebtedness, which did not materially increase the liability of the guarantor, would not release him. In *Powers v. Clarke,* 127 N.

Y. 417 (28 N. E. 402), the creditor said to the surety that
the obligation of the principal debtor might be as high as
$1,000. In a letter guaranteeing the obligation, the surety
said he understood the indebtedness would be about $600.
In truth, it turned out to be about $900, and it was held
the parties had made estimates only, and that there was
no false representation which discharged the surety.

### 4-g

There is no *scienter*. Aside from the fact that the in-
debtedness was, in fact, inconsiderable, Sherman had every
right to believe that it was inconsiderable. In February,
1908, Smith wrote Sherman that the bank balance was un-
usually low, because of extra efforts to pay bills, and that
there was practically no need to buy anything. In January
and in March, Smith wrote in a way that advised Sherman
the indebtedness consisted of small items, aggregating a
small amount; and, something like a month before the notes
were signed, that Smith would proceed with collections as
urgently as possible, and that he was "satisfied bills will
all be paid, and something left by December." And Sher-
man testifies he considered the debts of the corporation
were all taken care of.

So far, we have assumed Sherman represented there
was *no* indebtedness. Smith says he did so represent. But
Brown testifies the statement was that the concern had
"practically no other debts, but might have said they had
a few small bills, current expenses, or things of that kind."
Certainly, the record justifies such a statement as that.

### 4-h

The only delinquent taxes were $51 for 1906 taxes, and
$26.56 for the second half of 1907. Sherman did not inform
Brown of this delinquency. If we assume that failure to
inform of this is the equivalent of having represented
fraudulently that it did not exist, and that the pleadings
cover such a misrepresentation, it remains true that a tax

indebtedness of $77.56 can hardly be treated as a material matter here. Be that as it may, the evidence fairly shows that Sherman had every reason to believe no taxes were delinquent. He could not have known or suspected that the taxes of 1906 were unpaid. They were due and payable in 1907, before the drug company was incorporated, and long before its transfer; and at the transfer, Smith had reported no unpaid taxes. Smith never included the 1906 taxes in any statement sent to Sherman. On March 16, 1908, he advised Sherman the taxes came to $47, and at the end of that month, he sent a statement of bills paid, which included as one item, "Insurance, rent, and taxes, $83.15."

4-i

There is no evidence that money was borrowed to pay debts and running expenses.

The proof fails to establish any right to release the sureties because of fraudulent representations to the effect that the trade was good and that the store was doing a nice business. The essential complaint is that it had run at a loss for six months, and was heavily indebted. The proof does not so show.

V. At the time when the sureties signed, injunction proceedings were pending, to restrain the drug company from selling or keeping liquor, in violation of law. Sherman knew of the pendency of this suit, and did not inform Brown of it. It is not charged that he made any misrepresentation, as for instance, that no such suit was pending; and at this point, appellees rely upon the proposition that failure to speak to this point was a fraudulent concealment, and the equivalent of an affirmative fraudulent misrepresentation on the point. For the sake of argument, we will assume this. The question remains whether the suppression was that of a material fact. The position of the appellees is that it is that, because this injunction proceeding was very

6. PRINCIPAL AND SURETY: nonmaterial concealment.

detrimental to the business of the drug company, and caused it great loss. The evidence does not disclose Sherman believed the proceeding was dangerous. . The first knowledge he had of the proceedings was given by a letter from Smith, of date September 2, 1908, in which it was said:

"I do not believe they have very much against us, and hope we can beat them to it. However, should an injunction be granted, it will be November 1st before it is in effect, and as there is no local opposition at all here, we believe it can be dissolved at an early date. My attorney and I went through all the reports since January, 1908, and could find no error of any kind."

And in a letter of October 11, 1908, speaking of depositions to be taken, Smith wrote:

"I have looked each witness up carefully, and am satisfied that they will do me no harm at the hearing Friday, which makes our case look more hopeful. Personally, I believe we have an excellent chance to win out."

Sherman testifies that, while the proceedings were pending, there was a question whether injunction would be granted. It may be conceded the correspondence shows Sherman was of opinion that, if an injunction were granted, it would compel operating the business without profit, if not at a loss. Be that so, yet the ultimate claim of the appellees is that, whatever might be true of the mere pendency of the injunction proceedings, the entry of the injunction worked substantial injury, because the concern could thereafter sell *no* liquor; and that this inability to sell liquor "took away all of that business, and hurt the business in other ways, and hurt the town more or less, so that our business fell off in all lines by the fact of that injunction; and after the injunction was granted, our sales fell off at once,—I would say fully 50 per cent." Now, if the fact that business thus fell off after the injunction was granted settles that this was due to the granting of the in-

junction, it would follow that to conceal so injurious a thing as this would be the concealment of a material matter. But may we thus be concluded? The fact that business fell off to this extent is, as has been seen, contradicted by the testimony of both Smith and Brown. But suppose it did fall off to the extent stated, or some material extent. How does that prove that it was due to the entry of a decree forbidding nothing but the unlawful sale of intoxicating liquors? The right to sell liquor lawfully remained. If, then, the sureties have cause to complain that a material concealment was practiced, it is, in effect, grounded on the assertion that they consider the practice of violating the liquor law a substantial business asset, and would not have signed the notes, had they known the business was threatened with being stopped from selling liquor, in violation of law. It is said in *Franklin Bank v. Stevens*, 39 Me. 532, at 539, that, while many things indirectly affect the liability of the surety, the misrepresentation or concealment which will release him must be something that immediately affects his liability, and bears directly upon the particular transaction to which the suretyship attaches. The case of the appellees is not within this pronouncement. First, there is no competent proof that the pendency of the injunction suit affected the prosperity of the business, nor that the injunction subsequently entered did. Second, it has been demonstrated that neither could have caused anything which, in law or good morals, is an injury. It does not lie in the mouth of these sureties to say they would not have become sureties if they had been advised that the drug store was in danger of being prevented from selling liquor in violation of law. Now, it transpired that, upon the entry of the injunction, there was some $400 to pay, in costs and attorney fees. As has been said, Sherman believed, during the pendency of the injunction proceedings, that they would never result in an injunction.

There is no evidence what expense, if any, attached to the mere pendency of the proceedings. We have held that lawful and substantial consideration passed for the notes. We are disinclined to cancel them because plaintiff, who believed they would prove abortive, did not inform Brown that injunction proceedings were pending, and, after the notes were signed, a cost and attorney fee bill of $400 existed. If paid, it took a long time to have it affect the prosperity of the business; for, as has been seen, it did not disenable Smith from making 14 monthly payments of $100 each, nor prevent Brown from writing, a long time afterwards, that he (Brown) had understood the business was splendid until the last few months before Brown so wrote.

VI.    The purpose was to sell the shares for their true value. The parties estimated that value to be $3,300, and Smith says they were worth not over 60 per cent of that. It is pleaded that, if the correct amounts of the debts had been deducted, the 33 shares would have had an estimated value of but $1,800, and that, therefore, the estimated consideration put into the notes is too large by $966.66; and it is additionally prayed that, because of mutual mistake, the notes should be reformed by giving credit in $966.66 as of the date of the note. There is no proof that justifies reformation.

VII.    Both sides urge that the other was guilty of laches. We have no occasion to consider the claim. No laches is pleaded, nor is there any substantial evidence of any. The issue may not be raised on this appeal for the first time.

The decree is reversed. The trial court will enter judgment for plaintiff, as prayed, against the defendants Gertrude Smith and O. C. Brown, or, at his election, appellant may, in rule manner, obtain such decree in this court.— *Reversed.*

LADD, EVANS, and STEVENS, JJ., concur.