HENRY W. LEX et al., Appellees, v. SELWAY STEEL CORPORATION et al., Appellees; FRED BROWN et al., Appellants.

**APPEAL AND ERROR:** Harmless Error—Refusal to Transfer Action.
1  Error in refusing to transfer an action to the county of defendant's residence becomes inconsequential when, in the further making up of the issues, either by additional pleadings in the case itself or by intervention therein or by proper consolidation of the action with other actions, the nature of the final action as tried becomes such that it might have been brought originally against all the defendants in the county in which the original action or actions were brought. (See Book of Anno., Vol. 1, Sec. 11548.)

**PARTIES:** Permissible Defendants—Action by Stockholder for Contribution.
2  All stockholders of a corporation are proper parties to an action by one stockholder who has fully paid for his stock, for contribution from the other stockholders who have not fully paid for their stock, in order to equalize the losses between stockholders.

**PARTIES:** Permissible Defendants—Action to Dissolve Corporation.
3  All stockholders of a corporation are proper parties to an action by the state to dissolve the corporation.

**VENUE:** Change of Place of Trial—Fraud in Inception of Contract—Nonapplicability of Statute.
4  Nonapplicability of Statute. The statutory provision (Sec. 11411,

Code of 1924) to the effect that, when a defendant is sued on a written contract in the county of agreed performance, he may have the cause removed to the county of his residence on a showing of nullifying fraud in the inception of the contract, has no application to an action brought against a stockholder of a corporation on his stock subscription which contains no agreement as to the place of payment.

**ACTIONS:  Consolidation—Law and Equitable Actions.** Actions which seek one or more of the following purposes are properly consolidated:

1. Equitable actions for the appointment of a receiver for a corporation and for the closing up of its affairs.

2. Equitable actions by the state for the dissolution of the said corporation.

3. Equitable actions by a stockholder of the said corporation who has fully paid for his stock, for contribution from the other stockholders who have not fully paid for their stock, in order that losses may be equalized on the stockholders.

4. Equitable actions by the executor of a deceased stockholder against the receiver of the corporation for the cancellation of an alleged fraudulently induced stock-subscription contract and for the return of the money paid thereon, met by the receiver with a prayer for judgment for the amount due under the contract.

5. Law actions by the receiver of the said corporation or by the judgment creditors thereof, to recover of the stockholders the amount unpaid on their stock subscriptions.

**APPEAL AND ERROR:  Harmless Error—Premature Consolidation of Actions.** The fact that an order for the consolidation of actions was entered prior to the time when the issues were fully made up, and without notice to some of the parties, will not affect the judgment subsequently entered, when the results obtained were the same as would have been obtained, had the order been made on notice and after the issues were fully made up.

**CORPORATIONS:  Subscription to Stock—Liability.** A subscriber for corporate stock on specified terms of payment is liable *on his contract of subscription* (except in those cases where the defensive plea of fraud is available), even though no certificate of stock has been or can be legally issued to him until payment has been made in full, and even though he is not deemed a "stockholder" until he has paid in full; and this is true irrespective of the statute (Sec. 8394, Code of 1924) which declares the stockholder's liability for unpaid installments on stock "*owned by him.*"

**CORPORATIONS:  Subscriptions to Stock—Fraud in Avoidance.** A subscriber for corporate shares of stock whose contract of subscription has been fraudulently induced by the corporation or by its agents may

avail himself of such fraud and avoid all liability on such contract (1) by properly and with due diligence rescinding such contract while the corporation is a going concern, though insolvent, or (2) by pleading said fraud (due diligence being assumed) as a complete defense to an action by the receiver of the insolvent corporation to recover on such contract for the benefit of corporate creditors, *unless the receiver avoids the plea by proof of the existence of unpaid corporate debts contracted subsequent to the said contract of subscription.*

CORPORATIONS: Stockholders—Right to Contribution to Equalize Burdens. Corporate stockholders who have fully paid for their stock may, upon the insolvency of the corporation, maintain an action for contribution against stockholders who have not fully paid for their stock, in order that, in the final settlement of the corporate affairs, the burden of discharging corporate obligations may rest upon all stockholders in proportion to their respective stock holdings or obligations; and it is immaterial that *all* the stockholders were fraudulently induced by the corporation to subscribe for the stock.

ACTIONS: Dismissal—Effect on Cross-petition. An executor who institutes an authorized action against a corporate receiver in the county of the receiver's appointment, for relief against an alleged fraud-induced contract by the deceased, and (1) is met by a cross-petition for judgment on the said contract, and (2) has his action properly consolidated with divers other actions under duly joined issues *which might have been the basis of an original action against the executor in said county of suit,* may not thereupon, after dismissing his action, have all proceedings against himself and the estate dismissed on the claim that the probate court which appointed him had sole jurisdiction to render a judgment against him or against the estate.

BILLS AND NOTES: Indorsement—Ratification of Unauthorized Indorsement. Evidence held to show the ratification of an unauthorized indorsement of a promissory note.

CORPORATIONS: Subscriptions to Stock—Voidable Subscriptions. A stock-subscription contract to the effect that the corporation will accept in payment for its stock future services of undetermined value to be rendered by the subscriber is voidable by the corporate receiver who is seeking to recover for the benefit of creditors the amount due on the stock subscription.

VENUE: Place of Trial—Improper Joinder in Foreign County. A party who is sued in a county which is not the county of his residence, on *two* causes of action, *one* of which is not properly suable in such foreign county, may have the place of trial of the latter action changed to the county of his residence.

BILLS AND NOTES: Indorsement—Authorized But Bad-faith Indorsement by Corporate Officers. The fact that the duly authorized

officers of a corporation in indorsing in the name of the corporation a promissory note payable to it were not in good faith furthering the interest of the corporation, will not affect the rights of the good-faith indorsee who was not chargeable with knowledge of the bad faith actuating the said officers.

**CORPORATIONS:** Subscriptions to Stock—Unexecuted Rescission—Relief Against Receiver. A subscriber for corporate shares of stock who, while the corporation is a going concern, enters into a bona-fide agreement with the corporation for the complete rescission of the stock-subscription contract will be entitled to judgment against a subsequently appointed receiver for the amount of the stock-subscription notes executed by him and transferred by the corporation and not returned to him as provided in the contract of rescission.

**CORPORATIONS:** Subscriptions to Stock—Unallowable Plea of Satisfaction. A subscriber for corporate shares of stock may not avoid a judgment for the amount due on his subscription by a showing that he had indorsed to the corporation the note of a third party under an agreement that the corporation would collect the note and pay to the subscriber the balance remaining after satisfying the stock-subscription contract.

FAVILLE, C. J., and ALBERT, J., dissent to the holdings in part.

Headnote 1: 4 C. J. p. 948 (Anno.) Headnote 2: 14 C. J. p. 1138. Headnote 3: 14a C. J. p. 1137 (Anno.) Headnote 4: 40 Cyc. p. 126. Headnote 5, 10: 1 C. J. pp. 1129, 1130. Headnote 6: 4 C. J. p. 924. Headnote 7: 14 C. J. p. 547. Headnote 8: 14 C. J. pp. 590, 592, 596, 601, 602, 1099. Headnote 9: 14 C. J. p. 1136 (Anno.) Headnote 11: 1 C. J. p. 1136 (Anno.) Headnote 12: 8 C. J. p. 1051. Headnote 13, 15: 14a C. J. p. 994. Headnote 14: 40 Cyc. p. 118. Headnote 16: 8 C. J. p. 806 (Anno.); 14a C. J. p. 737. Headnote 17: 14a C. J. p. 1012. Headnote 18: 14 C. J. p. 967 (Anno.)

Headnote 3: 7 R. C. L. 728. Headnote 17: 7 R. C. L. 358.

*Appeal from Polk District Court.—*JAMES C. HUME, Judge.

DECEMBER 15, 1925.

REHEARING DENIED APRIL 7, 1927.

The opinion states the facts.—*Affirmed in part; reversed in part.*

*Howard L. Bump,* for plaintiffs.

*Howard L. Bump* and *James M. Parsons,* for receiver.

*Brockett, Strauss & Blake,* for Selway Steel Corporation, Selway Steel Post & Fence Co., Selway Steel Post Co., and Robert R. Selway.

*Guy A. Miller,* for Herman H. Budke.

*Parrish, Cohen, Guthrie & Watters,* for interveners General Fireproofing Co. and Republic Iron & Steel Co.

*Lehmann, Seevers & Hurlburt,* for M. W. Richey, intervener.

*Charles Hutchinson* and *Clark & Byers,* for Van S. Allen, John Mohnssen, Peter J. Mohnssen, Samuel Zeigenhorn, Joseph O'Brien, Garrett W. Wiggers, John H. Schmitz, John J. Blum, and William Thompson, administrator.

*Stewart & Hextell,* for Robert C. Friar and Thomas H. Friar.

*Lappen & Carlson* and *Wilson & Shaw,* for Melvina Mogul and Phillip Brody.

*Lappen & Carlson* and *Loepp & Walter,* for Heiko J. Muller.

*Lappen & Carlson,* for H. B. Spellman.

*F. J. McGreevy,* for D. E. Aukes, R. C. Bode, H. J. Frerichs, Rath State Exchange Bank, and Farmers & Merchants Savings Bank.

*Tesdell & Mackaman* and *Kimball, Peterson & Smith,* for A. F. Dammerow and John Schnepel.

*Charles W. Lyon* and *J. C. McCoid,* for F. B. Montgomery and S. T. Hills.

*John McLennan* and *Molsberry & Reaney,* for C. E. Cummings.

*John McLennan* and *Robertson & Robertson,* for Fred Brown.

*Salinger, Reynolds, Meyers & Cooney,* for Louis Baumhover, J. M. Bell, G. William Dunlop, C. D. Enfield, Adolph

Fricke, William Fricke, Jacob H. Janssen, Matt Lappe, C. A. Langenfeld, John Schleisman, John R. Wolfe, William Wittrock, August Wittrock, G. S. Toliver, Executor, Albert Copp, and Elias Barg.

*E. A. Wissler,* for Albert Copp.

*W. C.* and *W. I. Saul,* for Peter W. Bartels.

*Frank J. Comfort,* for Henry W. Hansen and William Guttenfelder.

*Ray Fountain* and *Swan, Clovis & Swan,* for J. A. Nelson and C. F. Beekman.

*Dale & Harvison,* for J. A. Haugh.

*Clem Wade, H. J. Fitzgerald,* and *W. H. Salisbury,* for F. O. Martin.

*Clem Wade,* for W. G. Shelldorff.

*O'Connor & Rader,* for Adolph Vogel and Oscar Z. Fox.

*Miller, Kelly, Shuttleworth & Seeburger* and *Mallory & Leming,* for C. E. Shafer, M. Mennenga, C. C. Scantlebury, J. A. Miller, A. J. Hobson, W. R. Bunker, and W. G. Atzbaugh.

*Miller, Kelly, Shuttleworth & Seeburger* and *Miller & Everett,* for Sam Johnson.

*Miller, Kelly, Shuttleworth & Seeburger,* for Ed M. Workman and N. D. Shinn.

*Miller, Kelly, Shuttleworth & Seeburger* and *E. W. Weeks,* for I. P. Horton.

*Miller, Kelly, Shuttleworth & Seeburger* and *E. R. O'Brien,* for L. J. Fridley.

*F. J. McGreevy* and *Stipp, Perry, Bannister & Starzinger,* for Walter G. Austin.

*Stipp, Perry, Bannister & Starzinger.* and *J. W. Kridelbaugh,* for A. L. Nye and W. A. Eikenberry.

*Wambach & Daly,* for G. Romanelli.

*Carr, Cox, Evans & Riley* and *McGrath & Archerd,* for

Elias Barg, F. G. Brisbin, H. H. Fritze, Gordon Gibbs, L. G. Hill, S. S. Hamilton, G. J. Meier, Carl Neilsen, B. J. Tillman, and William Young.

*George Hise,* for Frank Katzer and Patrick O. McWilliams.

*George Hise* and *Burnstedt & Hemingway,* for W. A. Anderson and John Johnson.

*Wilson & Shaw* and *E. N. Farber,* for Nora E. Storjahann and Henry M. White.

*Wilson & Shaw* and *W. J. Keefe,* for George W. Kroh.

*Wilson & Shaw* and *Poston & Murrow,* for J. K. Green.

*Wilson & Shaw,* for C. E. Carlson, F. W. Martens, J. F. Martens, and J. E. Reid.

*Ladd, Warren & Ladd* and *Church & McCully,* for Andrew Schmidt and G. S. Toliver, Executor.

*Thomas J. Bray* and *James G. Shifflett,* for William Robbins.

*John J. Myerly* and *James E. Goodwin,* for Grimes Savings Bank.

*Clyde C. Coyle,* for Geo. W. Lowis and P. G. Farnsley.

*John D. Denison,* for J. E. Campbell and J. L. Taylor.

*John L. Gillespie,* for P. J. Weil and J. C. Weil.

*Weir Casady* and *Wilson & Shaw,* for Norwalk State Bank.

*R. N. Johnson* and *Miller, Kelly, Shuttleworth & Seeburger,* for John Lingenfelter.

*Harold S. Thomas,* for Estate of George Frost.

*Edwin D. Samson* and *A. V. Proudfoot,* for Vern Smith, Mrs. E. W. and Madge Frances Smith.

*Weir Casady,* for D. H. Martens.

*Ben J. Gibson,* Attorney-general, and *William R. C. Kendrick,* Assistant Attorney-general, for the state of Iowa.

*C. L. Nourse,* for Iowa Loan & Trust Co.

*Ira. W. Jones,* for George W. Grimm and Elmer S. Grimm.

*Judson Piper,* for George N. Felgar.

*Carr, Cox, Evans & Riley,* for John Justice.

*W. A. Cook,* for A. C. Meyer.

*Clock & Saley,* for W. A. Nalan.

*Lehmann, Seevers & Hurlburt,* for J. J. O'Laughlin.

*J. W. Kridelbaugh,* for John A. Pos.

*Thornell & Thornell,* for E. Smith.

*H. S. Martin,* for A. H. Stoll.

*W. C. Shepard,* for George W. Raisty.

*J. E. Jordan,* for McIlhinney Investment Co.

*John B. Sullivan,* for John J. Jacklin.

VERMILION, J.—This case, in the form in which it comes to us on this appeal, involves, in its general aspects, the right of the receiver of the Selway Steel Post & Fence Company, an insolvent corporation, and two judgment creditors of the corporation on their own behalf, to recover, as against subscribers to its capital stock, the amounts unpaid on their subscriptions, and the right of stockholders who have paid in full for their stock to contribution from subscribers who have not so paid in full, to the end that, as between them, the loss shall be equalized. The case assumed these aspects only after many mutations, some of which will be referred to in the further consideration of the questions presented. It may here be briefly noted, however, that the present case is a consolidation of sixteen cases against the Selway Steel Post & Fence Company—which will for convenience be referred to as the corporation—or its receiver. The decree below granted the general relief asked by the receiver as against all of the defendant subscribers who had not rescinded their contracts of subscription prior to filing of the application for the appointment of the receiver, but denied a recovery as against those who had so rescinded; sustained the claim to contribution of stockholders whose stock was fully paid for; and denied individual relief to the two creditors referred to above. A portion

of the defendants against whom a recovery was granted, appeal. The plaintiffs appeal from the decree denying them relief against certain defendants. The creditors appeal from the decree against them.

Numerous questions arise, affecting the claims of particular defendants, that will be considered in later divisions of this opinion.

The principal and ultimate question involved in the claims of all but a few of the parties is as to the right of the receiver, or the creditors, to recover against subscribers to the stock of the corporation who were induced to enter into subscription contracts by fraud of the corporation or its agents.

Some questions are presented affecting all, or a considerable portion, of those sought to be held as subscribers to the stock, which it is necessary to dispose of before passing to a consideration of the principal question.

I. Many of the defendants are not residents of Polk County, where the actions were commenced, and, at various stages of the original actions, and when called upon to answer the present claims of the receiver and the complaining creditors, they endeavored by motions to have the place of trial changed, as to them, to the various counties of their residence. These motions were all overruled.

1. Appeal and Error: harmless error: refusal to transfer action.

The original action was by Lex and Harlan, as plaintiffs, against the Selway Steel Post & Fence Company, the corporation primarily involved, and certain of its officers; the Selway Steel Post Company, a copartnership, to whose property and rights it was alleged the corporation had succeeded; and the Selway Steel Corporation, to which it was alleged the property of the first named corporation was about to be fraudulently transferred. The petition was filed October 12, 1920. The plaintiffs alleged that they were stockholders in the first named corporation, and had paid in full for their stock, and they asked and procured the appointment of a receiver for the Selway Steel Fence & Post Company. On April 7, 1921, the plaintiffs in that action filed an amendment to their petition, in which they asked that all who had subscribed for stock in the principal corporation be made parties; that the affairs of the corporation be wound up; and that subscribers to stock who had not paid their subscriptions in

full be required to pay such amounts, in addition to what they had paid, as would make the burden equal upon all stock subscribers; and that plaintiffs, and all others who cared to join with them and who had paid in full for their stock, have contribution from those who had not so paid.   On April 8, 1921, the General Fireproofing Company, a judgment creditor of the corporation, by an amended and substituted petition, in an action in equity commenced by it against subscribers to the stock of the Selway Steel Post & Fence Company, asked that the defendants be required to pay into court, to the extent of their liability as subscribers, an amount sufficient to pay its judgment and the claims of any other creditors who might elect to come into the case.   The Republic Iron & Steel Company, holding an unpaid judgment against the corporation, intervened, and joined the plaintiff therein in asking the same relief.   The receiver subsequently intervened in the latter action, asking that the subscriber defendants be required to pay to the extent of their liability, to satisfy the debts of the corporation.

The State, by the attorney-general as relator, intervened in the original action, alleging various acts of fraud and mismanagement on the part of the officers of the corporation, and that it was insolvent, and asked that its franchise be canceled, the corporation dissolved, and its property held by the receiver distributed among the creditors and stockholders.   As stated, all of these actions were consolidated.

We are not now called upon to determine whether motions made in the creditor's suit, to transfer the causes of action against individual defendants to the counties of their residence, were properly overruled, since, by the amendment and the consolidation of the other actions with it, if proper, any error in that respect was without prejudice.   If the issue as finally presented and tried by the court was such that the defendants were properly joined and suable in the county where the action was pending, they were not prejudiced by an earlier ruling,—if it be assumed to have been erroneous, as the issues then stood,— refusing a change of the place of trial. *Miller v. Hawkeye Gold Dredging Co.*, 156 Iowa 557.   It should require no argument to sustain the proposition that, in an action by one stockholder of a

2. PARTIES: permissible defendants: action by stockholder for contribution.

corporation for contribution from the other
other stockholders, to the end that the loss
should be equally borne by all, all the stock-
holders would be proper parties, and that the
action could be maintained in the county where the corporation
and some of the stockholders were resident; or that they would
all be proper parties in an action by the state to dissolve the
corporation. Sections 3465 and 3501, Code of 1897 (Sections
10975 and 11049, Code of 1924); *Merrill v. Prescott,* 67 Kan.
767 (74 Pac. 259); *Hinshaw v. Austin,* 64 Kan. 460 (67 Pac.
882); *Allen v. Fairbanks,* 45 Fed. 445; *Van Pelt v. Gardner,* 54
Neb. 701 (75 N. W. 874).

*3. PARTIES: permissible defendants: action to dissolve corporation.*

The issue, as tried, was not a mere money demand by cred-
itors or the receiver for the amount of unpaid subscriptions, as
was the case in *Kell v. Lund,* 99 Iowa 153, relied upon by the
defendants. It was there held that the obligation of each stock-
holder was individual and independent; that there was no union
of obligation; and that a defendant not residing in the county
where sued had a right to have the case as to him transferred to
the county of his residence. It was recognized, however, that, if
there was any question of adjustment as between delinquent
stockholders, the rule might be different. The case is not con-
trolling in the situation presented here.

Paragraph 6 of Section 3505 of the 1913 Supplement to the
Code, providing that, where suit is brought on a written contract
in the county where it is by its terms to be performed, a defend-
ant residing in a different county may, on filing
a sworn answer alleging fraud in the inception
of the contract constituting a complete defense,
have the place of trial changed to the county of
his residence, is not applicable to the instant
situation. The actions were not upon the notes given by sub-
scribers for the unpaid portion of their subscriptions; the sub-
scription contracts did not provide that they were to be per-
formed in Polk County; and jurisdiction in Polk County was
not invoked on the theory that the subscriptions were payable
there.

*4. VENUE: change of place of trial: fraud in inception of contract: non-applicability of statute.*

Since the subscriber defendants were properly joined and
suable in Polk County in the action by the stockholders, if the
actions were properly consolidated, there was no reversible error

in overruling the motions in the other cases to transfer to the counties of the residence of the individual defendants, except as hereinafter noted.

What might have been the situation in respect to the motions to transfer, had it appeared, even on final hearing, that the amount for which subscriber defendants could be liable did not exceed the established debts of the corporation, and therefore the claim for contribution must, in any event, fail, and whether, in such case, the creditors or the receiver would have been relegated to actions against the individual subscribers, with a resultant right on the part of a defendant to insist that he be sued only in the county of his residence, we are not called upon to consider; for the aggregate amount of the judgments against subscriber defendants exceeds the debts of the corporation. If the judgments are affirmed, and the claim for contribution, upon which the right to sue in Polk County depends, is upheld, no right to a change of place of trial existed.

II.  Speaking generally of the actions against the corporation and its stockholders by the original plaintiffs, the creditors and the receiver, we think there was no error in consolidating

5. ACTIONS: consolidation: law and equitable actions.

them. The actions were in equity. Section 3427, Code of 1897 (Section 10941, Code of 1924) ; Section 3644, Code of 1897 (Section 11226, Code of 1924) ; *Toledo Sav. Bank v. Johnston,* 94 Iowa 212; *Rutenbeck v. Hohn,* 143 Iowa 13; *Patterson v. Lynde,* 106 U. S. 519 (27 L. Ed. 265) ; *Burke v. Smith,* 83 U. S. 390 (21 L. Ed. 361) ; *Hatch v. Dana,* 101 U. S. 205 (25 L. Ed. 885).

There was involved in the action by the stockholders and the intervention by the state the winding up of the affairs of the corporation. Necessarily included in this was the issue, in the action by the General Fireproofing Company and the interventions of the Republic Iron & Steel Company and the receiver, as to the liability of the defendant subscribers for the unpaid portion of their subscriptions. That these issues might have been presented in one action in which all of these parties were joined, is apparent. Sections 3545 and 3644, Code of 1897 (Sections 10960 and 11226, Code of 1924) ; *Turner v. Bradley,* 85 Iowa 512; *Cox Shoe Co. v. Adams,* 105 Iowa 402. In the case last cited, we quoted approvingly the language of the Wisconsin Supreme Court in *Biron v. Edwards,* 77 Wis. 477, as follows:

"We cannot doubt that the power inheres in a court of equity, in its discretion, to consolidate causes pending therein, for the purpose of avoiding a multiplicity of suits and trials, when the consolidation can work no injury to any party. This power is essential to the proper administration of justice, and does not depend upon any statute for its existence."

We said:

"Section 3644 of the Code does not apply to such a case as that before us, and we do not think the remedy there provided is exclusive."

As we have said above, the subscribers for stock were properly joined in the action of the stockholders involving the rights of the subscribers among themselves. The fact that the order of consolidation was made before the defendants were required to plead to the amended petition filed by Lex and Harlan, making them parties in the original action, and therefore without notice to them, does not affect the validity of the judgment, if the consolidation was proper and the result would have been the same. *Willard v. Calhoun*, 70 Iowa 650.

6. APPEAL AND ERROR: harmless error: premature consolidation of actions.

III. Section 1631, Code of 1897 (Section 8394, Code of 1924), is as follows:

"Neither anything in this chapter contained, nor any provisions in the articles of corporation, shall exempt the stockholders from individual liability to the amount of the unpaid installments on the stock owned by them, or transferred by them for the purpose of defrauding creditors; and execution against the company may, to that extent, be levied upon the private property of any such individual."

7. CORPORATIONS: subscription to stock: liability.

It is contended by the defendants that, as mere subscribers to the stock of the corporation, to whom no stock had been issued, and to whom, under the terms of their subscription contracts and the statute, Section 1641-b, Code Supplement, 1913 (Section 8412, Code of 1924), no stock could be issued by the corporation, until payment in full of the par value had been made, they are not stockholders, and are not liable under the statute.

Before the enactment of the statute last referred to, prohibiting the issuing of certificates of stock until the corporation has received the par value thereof, it had been held that a sub-

scriber to stock became a stockholder by virtue of the subscription, in the absence of a provision requiring a payment as a condition of membership, and that this was true without the issuance of any certificate of stock. *Waukon & M. R. Co. v. Dwyer,* 49 Iowa 121.

Here, no stock was issued, and the subscription contracts entered into by the subscribers expressly provided that they should pay $100 per share, the par value, of which $40 should be in cash, and the balance evidenced by a promissory note; that no stock should be sold for less than $100 per share; and that, when the payments were made in full, certificates of stock should be issued. In some cases, it seems, notes were taken for the full amount of the subscription. In this situation, it would not appear that the statute had been violated. .

"The statute does not forbid the execution of a promise to pay the par value of the stock in advance of the issuance thereof." *First Nat. Bank v. Fulton,* 156 Iowa 734.

The contracts of subscription required payment in full as a condition of membership. *Waukon & M. R. Co. v. Dwyer,* supra. The statute provides that "stockholders" shall not be exempt from liability to the amount of the unpaid installments on the stock "owned by them." The statute is by its terms a denial of exemption from liability for corporate debts to be created by contract. It doubtless imposes a liability under certain circumstances where none is created by contract, and stock has been issued without the payment of par therefor, or where it is attempted by contract to relieve a stockholder from such liability. But here, the question of fraud in the procuring of their subscriptions being, for the moment, left out of view, the subscribers are under a liability created by their contracts of subscription.

Under the holding in *First Nat. Bank v. Fulton,* supra, and *Sherman v. Smith,* 185 Iowa 654, the statutory prohibition against the issuance of stock until payment in full of the par value had been made, furnishes no defense to the obligation of the subscriber to pay for the stock for which he subscribes. It is not doubted that he could, as against the corporation, escape this obligation on the ground of fraud, upon a proper showing; but his right to rescind after the insolvency of the corporation, as against its creditors or the receiver, representing creditors, presents a different question, which will presently be considered.

But the point here is that neither his liability nor his right to rescind depends alone upon the fact that stock was or was not issued to him. *Independent V. & S. Co. v. Iowa Merc. Co.,* 184 Iowa 154; *Lamb v. Bonesteel,* 186 Iowa 971. If he has not rescinded and cannot rescind,—that is to say, if the fraud in the inception of his contract is not available to him as a defense,— he is liable for the unpaid portion of his subscription whether stock has been issued to him or not. In this view of the matter, any distinction between one who has subscribed for stock under a contract by which the stock was to be issued to him on payment therefor in full, and one to whom stock has been issued without payment in full, is in itself, we think, quite immaterial to the present inquiry. Indeed, if such a distinction must be made, the statute (Section 1631) providing that neither the statute itself nor the articles of incorporation shall exempt the stockholders from individual liability to the amount of unpaid installments on the stock owned by them, has no force whatever; for if, under Section 1641-b, providing that no stock shall be issued until payment in full of the par value has been made, no one can become a stockholder until his stock has been paid for in full, it follows that there can be no stockholder owing unpaid installments on his stock. In such case, the latter statute accomplishes precisely what the first prohibits: that is, the exemption of one whose stock is not fully paid for, from liability for corporate debts. It is clear, we think, that the legislature intended no such result, and that the reference to "stockholders" and stock "owned by them" is not to be given a narrow and technical meaning, to bring about such a result. It has been many times held that the capital stock of a corporation, as respects the rights of creditors, includes the unpaid subscriptions to its stock. *Sawyer v. Hoag,* 17 Wall. (U. S.) 610 (21 L. Ed. 731); *Upton v. Tribilcock,* 91 U. S. 45 (23 L. Ed. 203); *Scovill v. Thayer,* 105 U. S. 143 (26 L. Ed. 968); *State Tr. Co. v. Turner,* 111 Iowa 664.

The liability of the subscriber defendants to pay in full for the stock for which they subscribed, was created by contract, and, unless the pleaded fraud is available to them in defense, such liability may be enforced for the benefit of creditors; and no obstacle to this is to be found in the statute.

IV. It is the contention of the receiver that he is entitled

to recover the amount unpaid on all the stock subscriptions for the benefit of all creditors; and he especially insists that he is so entitled to recover as against all subscribers for stock who had not, prior to the filing of the petition for the appointment of a receiver, rescinded their subscription contracts. The above mentioned creditors join in these contentions by the receiver, and also insist that, if recovery cannot be had by the receiver, they are, in any event, entitled to recover as against all subscribers, whether they attempted to rescind or not, where payment had not been made in full, and where they had subscribed for stock prior to the time the creditors extended credit to the corporation, or, more particularly, prior to January 6, 1920, the date on which the corporation made a financial statement to certain commercial agencies, in reliance upon which the creditors claim to have extended credit.

8. CORPORATIONS: subscriptions to stock: fraud in avoidance.

For the stockholders whose stock has been paid for in full, it is insisted that the receiver should recover the full amount of the unpaid portion of the subscriptions, and, after satisfying the claims of creditors, apply any balance to equalizing the loss as between the stockholders and subscribers to the stock.

On the other hand, it is the contention of the defendant subscribers, generally speaking, that they can be held liable only upon proof—which they insist is not to be found in the record— that credit was extended to the corporation in reliance upon their subscriptions. With respect to the situation of certain subscribers, it is insisted that those who, after the appointment of the receiver, or in this action, took steps that would have been effectual, as against the corporation itself, to rescind their contracts of subscription, cannot be held, and that those who entered into subscription contracts after credit was extended to the corporation by the complaining creditors should have been released from liability. They deny any right of contribution, as between the stockholders and subscribers for stock.

It is generally conceded by all parties—although there may be exceptions where it is claimed there is a failure of proof in that respect—that all of the subscriptions to the stock of the insolvent corporation here involved were procured by false and fraudulent representations on the part of the corporation or its agents.

The contract of the subscriber is an executory one to take and pay for stock. As between himself and the corporation, as a going concern, it cannot be doubted that he would be entitled to urge any defense, including that of fraud, that would be available to him, were the contract for any other purpose. *Independent V. & S. Co. v. Iowa Merc. Co.*, supra. But upon the insolvency of the corporation, what is his relation and liability to creditors of the corporation and other stockholders who have paid in full for their stock? If he has paid a part, or even all, of a fraudulently procured subscription, he would, if acting with proper diligence and upon a sufficient tender of anything he had received, be entitled, as against the corporation, to recover what he had paid, and, in that situation, would himself be a creditor. But it is obvious that, as respects general creditors of the corporation, other essential factors may enter, and that the fact that he may be entitled, himself, to recover against the corporation, and so stand, himself, in the relation of creditor, is not necessarily conclusive upon the question. His contract is to become a member, a stockholder, in the corporation, and to become liable, to the extent of his agreed contribution to the capital of the corporation, or to the extent the law may impose liability, for the debts of the corporation.

Much is said in argument about the equality of equity as between a general creditor and a defrauded subscriber. There is a manifest distinction between one who, however he may have been induced to do so, purposed to contribute to the capital and participate in the venture of a corporation engaged in extensive business enterprises that would necessitate the incurring of corporate obligations to others, and one who deals with such a corporation as a stranger, in the ordinary course of its business, and in presumed reliance on its capital stock.

When question arises between the subscriber to stock in an insolvent corporation who would have a good defense as against the corporation, and a creditor who extended credit to the corporation, the courts have not always reached a uniform conclusion as to the test by which the respective rights and liabilities are to be determined. It has been held that, upon the insolvency of the corporation, or the commencement of proceedings to wind it up, the right of a subscriber to its stock to rescind his contract, even though he has been guilty of no laches, terminates as to

creditors. This is the rule of the English courts. *Hinkley v. Sac Oil & Pipe Line Co.,* 132 Iowa 396; 14 Corpus Juris 599. It is recognized that there is much confusion in the decisions of the courts of this country on the subject. 14 Corpus Juris 600. We do not find it necessary to engage in any discussion of the cases generally, or to attempt to determine where the weight of authority may lie upon the general proposition. The question has been under consideration by this court, and we see no occasion to depart from the principles heretofore deemed by us to be controlling.

In *Osgood & Moss v. King,* 42 Iowa 478, *State Bank Bldg. Co. v. Pierce,* 92 Iowa 668, and *Miller v. Hawkeye Gold Dredging Co.,* 156 Iowa 557, it is said that unpaid subscriptions to the capital stock of a corporation constitute a trust fund for its general creditors. In neither of these cases were the facts or the questions of law under consideration like those at bar.

In *Hinkley v. Sac Oil & Pipe Line Co.,* supra, which was an action by a stockholder to recover the amount paid for stock, and to cancel the stock, we said:

"The accepted doctrine in England is that a subscription for stock cannot be rescinded where suit is instituted subsequent to the insolvency of the company and when its affairs are being wound up. *Stone v. City & County Bank,* 3 C. P. 282; *Oakes v. Turquand,* L. R. 2 H. L. 325; *Henderson v. Royal British Bank,* 7 El. & Bl. 356, 363. It is said that no person who, at the commencement of the winding up, is *de facto* a member,—that is, who has, by a contract not previously avoided, become a member,—can withdraw from the distribution for the benefit of creditors any part of the company's assets, either by recalling money paid by him to the company or by taking himself out of the category of those liable to pay further calls. In consequence of the distribution of assets amongst creditors, a member cannot insist upon the equity which he might otherwise have claimed, to be relieved from his contract with the company. 2 Thompson on Corporations, Section 1441. But it seems that proceedings in insolvency of some nature must have been begun, or at least resolved upon, or that payment has been stopped by the company by reason of its insolvency. 10 Cyc. 439. Substantially the same doctrine prevails in this country, the difference being due to the fact that there is no public registration of shareholders

here, such as is required in England. In *Martin v. South Salem Land Co.*, 94 Va. 28 (26 S. E. 591), it was held that the shareholder cannot rescind his subscription on the ground of fraud, as against bona-fide creditors, after the corporation has stopped payment and become actually insolvent, unless he has been diligent in discovering and repudiating the fraud. But if he has been diligent in both these respects, the insolvency of the company alone will not defeat his right to rescission. *Beal v. Dillon*, 5 Kan. App. 27 (47 Pac. 317) ;*Newton Nat. Bank v. Newbegin*, 74 Fed. 135 (20 C. C. A. 339, 33 L. R. A. 727). The true rule, as it seems to us, is stated in *Fear v. Bartlett*, 81 Md. 435 (32 Atl. 322, 33 L. R. A. 721) ; and that is, the right to rescind may be exercised, assuming diligence, unless proceedings of insolvency, voluntary or involuntary, have been instituted, or some act has been committed which is regarded as an act of insolvency. Not until then does the entire property of the corporation, including unpaid subscriptions to its capital stock, become a trust fund for the payment of its debts, and not until then are the creditors entitled to the payment of their debts before there can be any distribution among the stockholders."

*Johnson v. Morgan*, 178 Iowa 577, was an action by creditors, in which the assignee of the corporation joined, to recover the amount due and unpaid on the purchase of stock in an insolvent corporation. The corporation was organized under the laws of South Dakota, and the note given by the defendant for the price of the stock was payable in that state. It was there observed that the South Dakota court had approved the rule that:

"* * * if a corporation is insolvent, a shareholder whose contract of subscription was obtained by fraud of the company's agents cannot diminish the security of bona-fide creditors by rescinding his contract to contribute the amount of capital subscribed by him."

We said that this court had adopted the same rule, and quoted from *Hinkley v. Sac Oil & Pipe Line Co.*, supra, in support of the statement. It was held that the plaintiff had not exercised proper diligence in rescinding.

In *Independent V. & S. Co. v. Iowa Merc. Co.*, supra, there was involved a claim by an intervener, a stockholder to whom the stock had been issued, against the receiver of the corporation,

to recover, on the ground of fraud, the notes given and money paid on the subscription. The discussion of the English rule in the cases of *Hinkley v. Sac Oil & Pipe Line Co.*, supra, and *Johnson v. Morgan*, supra, was referred to, and in reversing a judgment dismissing the petition, we said:

"To defeat plaintiff [intervener], we must be able to say, from this record, that he was lacking in diligence, from the mere fact that he did not discover the fraud and repudiate his contract sooner. We must be able to say that there are claims in the hands of the receiver to be satisfied out of the assets that accrued after the plaintiff had obligated himself as a stockholder. The only reason why equity should estop the plaintiff from recovering the notes and money out of which he had been defrauded, is that the rights of innocent persons have intervened, and that it would be inequitable against them to allow him to withdraw from the receiver the property received by the company, though fraudulently received."

In *Lamb v. Bonesteel*, supra, the receiver of an insolvent corporation brought action to recover the amount of a subscription to its stock. The defendant pleaded in defense that the subscription was obtained from him by fraudulent representations made to him by the corporation and its agents. A demurrer to the answer, on the ground that the fraud pleaded constituted no defense to an action by the receiver, was sustained. We said:

"The defendant makes the point at the outset that this case is ruled by our opinion in *Independent V. & S. Co. v. Iowa Merc. Co.*, 184 Iowa 154, a case involving a subscription to the stock of the same corporation; and unless we are to depart from the rule there followed, we think the contention is well founded. It is true that the holding there announced is, to some extent, at variance with what is usually spoken of as the 'English rule,' the authority of which has been recognized by the courts of some states; but the position taken by us in the cited case is in harmony with the precedents established in many jurisdictions, and is essentially fair and just. * * * The effect of our holding in the case referred to is to recognize the liability of the defrauded party on his subscription when it is shown 'that there are claims in the hands of the receiver to be satisfied out of the corporate assets, that accrued after the subscriber had obligated

himself as a stockholder;' and that this circumstance or situation is not to be presumed from the mere general statement or proof that the concern was insolvent when the receiver was appointed. * * * As we have already noted, that decision had not yet been announced when this case was tried below, and the extent to which the so-called 'English rule' governed the liability of subscribers to corporate stock had not been definitely settled or limited in this state. The judgment appealed from has the support of many authorities; but, as the question was still, to some extent, an open one in this jurisdiction, we have felt justified in adopting the rule which seems most in harmony with sound principle.''

The two cases last cited do no more, we think, than sustain the right of one whose subscription has been obtained by fraud of the corporation or its agents to rescind, as against the receiver, where no lack of diligence to discover the fraud and repudiate the contract appears, and where it is not shown that there are claims in the hands of the receiver that accrued after the subscriber had obligated himself. To this extent only do they modify or limit the rule prevailing in England and in many of the states, and approved by us in *Hinkley v. Sac Oil & Pipe Line Co.*, supra.

There is in these cases no repudiation of the doctrine that, upon the commencement of proceedings in insolvency, the unpaid subscriptions become a trust fund for the benefit of creditors. On the contrary, the rule is expressly recognized, with the qualification that it operates where there are debts of the corporation to be paid by the receiver that were incurred subsequent to the subscription. There is no denial of the right of the receiver to recover at all, nor is an absolute and unqualified right on the part of a defrauded subscriber to rescind promptly, as against the receiver, under any and all circumstances, sustained.

If it be conceded that, in an action by an individual creditor against a subscriber, the rights of the parties would be determined upon the principle of estoppel,—that the credit was extended in reliance upon the subscription,—it would seem that the right of the receiver to recover at all must be denied, or that it must be put upon a somewhat different basis. The receiver, so far as he represents creditors, represents all the creditors. If

entitled to recover at all, he must recover for all of them. If, however, the liability of a subscriber to pay corporate debts can only be considered as depending on the relative equities as between him and the individual creditor, it is apparent that the equities of creditors and subscribers are conflicting, and with such a situation a receiver has nothing to do. The enforcing of conflicting equities of creditors in the assets of the corporation is no part of the function or duty of the receiver. *Marion Tr. Co. v. Blish,* 170 Ind. 686 (84 N. E. 814, 18 L. R. A. [N. S.] 347). It would seem to follow that there would, in such case, be no right of recovery on the part of the receiver.

But must this situation result in the denial of any and all right on the part of a receiver to recover unpaid stock subscriptions for the benefit of creditors? If so, there is no force in the doctrine that unpaid subscriptions to corporate stock become, in the hands of a receiver, a trust fund for the benefit of creditors, and the right of a defrauded subscriber to rescind, as against a receiver, is never lost. But if that doctrine has force, and the right to rescind, as against the receiver, may be lost, when and under what circumstances is it to be applied, and the subscriber precluded? The English rule puts it, at the commencement of insolvency proceedings, or the commission of an act of insolvency. Such a rule, unqualified, might well result in imposing liability upon a subscriber whose subscription was subsequent to the claims of all creditors, and who, therefore, upon any principle of estoppel, and upon any theory that the one whose act made possible an injury to himself and another must suffer the loss, would have been under no liability to any individual creditor. The rule laid down in *Independent V. & S. Co. v. Iowa Merc. Co.,* supra, and *Lamb v. Bonesteel,* supra, both meets this contingency, by qualifying the English rule, and affords an answer to all queries, in that the right of the receiver to recover of the defrauded party on his subscription is recognized when "there are claims in the hands of the receiver, to be satisfied out of corporate assets, that accrued after the subscriber had obligated himself."

The rule both recognizes and applies the established doctrine that unpaid subscriptions are, in the hands of a receiver, a trust fund for the payment of corporate debts, and preserves, in principle and effect, so far as may be done consistently with the

right of the receiver to recover at all, and to such extent as the defrauded subscriber is entitled to its protection, the equitable rule that, as between two victims of a fraud, the loss is to be borne by one only when it may be said that his act made possible the loss of the other.

It is said that there is a failure of the proof required to establish liability on the part of the subscribers to the receiver. Again, the rule laid down in the cited cases indicates what facts must be shown, to deprive a given subscriber of the right to rescind his contract on account of fraud, as against the receiver. While it may be that something more is required, to fix the liability of a subscriber in a suit by a creditor, where equities arising from estoppel are to be enforced, and may be enforced, without destroying, as would be the case in an action by the receiver, the right to recover at all, proof that there are claims to be paid by the receiver that accrued after the date of the subscriber's obligation raises a fair presumption that credit was extended in reliance on the integrity of the then apparent capital stock of the corporation, if not on the particular subscription. *Savage v. Bartlett,* 78 Md. 561; *Dunn v. State Bank of Minneapolis,* 59 Minn. 221 (61 N. W. 27). This, under the rule of our former cases, is sufficient.

Where the English rule has not been followed in all its strictness, the fact that there are debts contracted subsequent to the subscription has generally been recognized as a circumstance sufficient to deprive the subscriber of the right to rescind, and, consequently, to support the right of the receiver to recover. If the subscriber has no right to rescind, there is no obstacle in the way of a recovery by the receiver.

An oft quoted statement of the rule is found in *Newton Nat. Bank v. Newbegin,* 20 C. C. A. 339 (74 Fed. 135, 33 L. R. A. 727). Judge Thayer, speaking for the United States Circuit Court of Appeals, there said—the emphasis being ours:

"If a considerable period of time has elapsed since the subscription was made; if the subscriber has actively participated in the management of the affairs of the corporation; if there has been any want of diligence on the part of the stockholder, either in discovering the alleged fraud or in taking steps to rescind when the fraud was discovered; and, *above all, if any considerable amount of corporate indebtedness has been created since the*

*subscription was made, which is outstanding and unpaid,—in all of these cases the right to rescind should be denied, where the attempt is not made until the corporation becomes insolvent."*

See, also, *Morrisey v. Williams,* 74 W. Va. 636 (82 S. E. 509, L. R. A. 1915 D 792) ; *Scott v. Latimer,* 33 C. C. A. 1 (89 Fed. 843) ; *Wallace v. Bacon,* 86 Fed. 553 ; *Wallace v. Hood,* 89 Fed. 11 ; *Grier v. Union Nat. L. Ins. Co.,* 217 Fed. 287 ; *Beal v. Dillon,* 5 Kan. App. 27 (47 Pac. 317) ; *Gress v. Knight,* 135 Ga. 60 (68 S. E. 834, 31 L. R. A. [N. S.] 900) ; *Park v. Kribs,* 24 Tex. Civ. App. 650 (60 S. W. 905) ; *Duffield v. Barnum Wire & Iron Works,* 64 Mich. 293 (31 N. W. 310) ; 2 Fletcher's Cyclopedia of Corporations, Section 636 ; 2 Clark & Marshall on Private Corporations 1486 ; Elliott on Private Corporations (4th Ed.), Section 378.

In the present case there are but two creditors who prosecuted proceedings on their own behalf, to recover unpaid subscriptions, and they concede that, if the right of the receiver to recover be sustained, they have no complaint of the refusal of the trial court to allow them individual relief. Other creditors whose claims were allowed can secure relief only through the receiver. The last subscription of any appellant was made July 1, 1920, and there are claims allowed against the receiver for debts contracted subsequent to that date to an amount much in excess of that subscription. The debts incurred after the next previous subscription involved on this appeal also greatly exceed the unpaid portion of the subscription. If account be taken of the dates of shipment by the General Fireproofing Company and the Republic Iron & Steel Company of purchases made by the corporation,—as we think may properly be done,—the indebtedness arising after each subscription involved in the subscribers' appeals will be found to be very largely in excess of such subscription. In such situation, no subscriber is prejudiced by permitting the receiver to recover all the unpaid portion of his subscription, for the recovery would not be in excess of his liability to the individual creditors. There is no evidence that creditors had knowledge, at the time credit was extended, of any right or claim on the part of the subscribers to rescind.

We are of the opinion that the court properly, upon the record presented, held the receiver entitled to recover the unpaid portions of their subscriptions from subscribers who had not

rescinded at the time application was made for the appointment of a receiver.

V.  It also follows from what has been said that the right of a defrauded stockholder to rescind his contract of subscription was not lost by the mere insolvency of the corporation, and that the court below properly dismissed the petitions of the creditors and receiver as against defendants who had so rescinded prior to October 12, 1920, the date of filing the petition for a receiver.

VI.  In respect to the claim on behalf of those stockholders who paid in full for their stock, for contribution from those who paid but a part, the defendant subscribers contend that they were all merely the victims of a fraud calculated to swindle them all out of the whole amount of their subscriptions, and that it is a mere fortuitous circumstance that the defendants had not paid for their stock in full, and therefore lost less by the fraud than those who had paid in full; that this circumstance confers no right of contribution in favor of the more unfortunate, nor any liability upon those who escaped the full effects of the fraud,—in short, that the law will not compel contribution between the victims of a fraud. If this were the only relation of the parties, the position would doubtless be sound; but it does not state the whole situation.

9. CORPORATIONS: stockholders: right to contribution to equalize burdens.

They all agreed to contribute of their funds, in proportion to their subscriptions to the corporate stock, to a common enterprise, to be prosecuted by means of a corporation.  They were all, we are justified in concluding from the evidence, induced to so agree by false representations as to the operations of the corporation.  The venture has failed.  The funds actually in the hands of the corporation, the proceeds, in part, of the amounts paid upon such subscriptions to the stock, have been dissipated in its operations and in the payment of obligations which it assumed, so that now its property and funds in the hands of the receiver are insufficient to pay its outstanding obligations to general creditors.  If the amount to be realized from the unpaid subscriptions, when collected in full, does no more than satisfy the established claims, the question of contribution becomes moot for all those who have paid in full before this proceeding, and those from whom the judgments herein may be collected will have contributed in proportion to their subscriptions, to the

payment of corporate debts.    But if more than sufficient to satisfy the established claims is collected, the question arises whether the surplus must be proportionately returned to those from whom it was collected, or used to enforce contribution and equality among the stockholders.

Section 1633, Code of 1897 (Section 8398, Code of 1924), provides:

"When the property of a stockholder is taken for a corporate debt, he may maintain an action against the corporation for indemnity, and against any of the other stockholders for contribution."

This statute, while it has particular reference to the situation provided for in preceding sections, Sections 1631 and 1632, Code of 1897 (Sections 8394, 8395, 8396, and 8397, Code of 1924), providing that execution against the company may be levied on private property of the stockholder, yet is but a recognition of the principle that, if a stockholder is compelled to pay more than his proportion of the debts of the corporation, he may maintain a suit against other stockholders for contribution. *Esgen v. Smith*, 113 Iowa 25.

The stockholder who has paid in full for his stock has, upon the insolvency of the corporation and the exhaustion of the funds in its hands in payment of its debts, been compelled to pay more than his just proportion of the corporate debts, as compared with a subscriber equally liable who has paid nothing, or but a portion of his subscription.    In *Esgen v. Smith*, supra, we said:

"The second rule [that of contribution] has its origin in the old equitable doctrine that 'equality is equity,' and that, 'where there is equality of right, there should be equality of burden.' Growing out of these maxims is the rule that a stockholder who has been compelled to pay more than his just proportion of unpaid subscriptions to the capital stock may enforce contribution from the other stockholders who have not paid their just proportion.    That this same rule should ordinarily be applied to a case where a stockholder has voluntarily paid more than his just proportion on his subscription to the stock seems clear.    There is the same reason here for the application of the equitable doctrines hitherto mentioned as where the payment is enforced by

action at the suit of a creditor. The mere fact that the payment is not voluntary is not controlling."

See, also, *Graves v. Denny*, 15 Ga. App. 718 (84 S. E. 187).

The doctrine of contribution in equity does not depend upon a joint liability, nor upon an implied contract. It is said in *Aspinwall v. Sacchi*, 57 N. Y. 331, to rest "on the principle that, when the parties stand *in equali jure,* the law requires equality, which is equity, and one of them shall not be obliged to bear the burden, in ease of the rest. It is founded, not on contract, but on the principle that equality of burden as to common right is equity. And the obligation to contribute arises from the nature of the relation between the parties."

In *Robinson v. Boyd*, 60 Ohio St. 57 (53 N. E. 494), it is said:

"We do not find the doctrine of contribution so limited [by privity of contract], nor is it required by the principle on which it rests. It is not founded on contract, but arises from the equitable consideration that persons subject to a common duty or debt should contribute equally to the discharge of the duty or debt; and so, where one performs the whole duty or pays the debt, or more than his aliquot part, each of the others should contribute to him, so as to equalize the discharge of what was a common burthen."

And again:

"If we take a view of the cases both in law and in equity, we shall find that contribution is bottomed and fixed upon principles of general justice, and does not spring from contract, though contract may qualify it."

The Supreme Court of Oregon, in *Durbin v. Kuney & Sayers,* 19 Ore. 71 (23 Pac. 661), after a review of authorities, said:

"So that it may be said, in regard to the right of contribution, that it does not matter whether the parties are jointly and severally bound, or only severally, nor whether they are bound by the same or separate instruments, or whether they knew of each other's engagements or not, or whether they are liable in the same or different amounts, provided their obligation be assumed in respect to one and the same transaction."

In *McBride v. Potter-Lovell Co.,* 169 Mass. 7 (47 N. E. 242, 61 Am. St. 265), various parties had placed their notes in the

hands of a common agent for sale, and the agent wrongfully pledged the notes to secure its own debt.  The court said:

"The liability to contribute does not depend on a contract between the parties who are held liable to contribute, and is not affected by the fact that notes were pledged and fell due and were paid at different times, or that some of them were paid only in part, or not at all. * * * The various parties selected a common agent, and this agent used its power to place them all under a common liability, thus virtually making them all sureties for itself. * * * But where several different parties have thus been exposed to loss by the fraud of their common agent, it is more equitable that the burden of the loss should be shared *pro rata*.   Under such circumstances, equality is equity, without respect to the time of the maturity of the notes."

With respect to the liability of stockholders for contribution, the Supreme Court of Kansas, in *Hinshaw v. Austin*, supra, held that:

"Where certain stockholders in a corporation guarantee the payment of promissory notes of the corporation, and, upon the notes' being reduced to judgments, part of such stockholders pay the judgments, they can maintain an action for contribution against both their co-stockholders who guaranteed payment of the notes and those who did not guarantee such payment, and recover from each of them his pro-rata share of corporate debts so paid."

In *Millaudon v. New Orleans & C. R. Co.*, 3 Rob. (La.) 488, the court said:

"As to the question how far the court can interfere to require a calling in of stock to meet the exigencies of the bank and to equalize the burden of the stockholders, we may repeat that we consider that the paramount duty of the board; and if they employ in paying debts any part of the fund furnished by Millaudon over and above the other stockholders, they are bound to replace it by calling in from the other stockholders such a proportion as will put all upon an equal footing * * *."

In *Matthews v. Albert*, 24 Md. 527, in speaking of a statute that imposed liability upon stockholders in favor of creditors until the amount of all stock was paid up, the court said:

"The proceeding here, however, is in equity, where the liability of the several defendants may be ascertained and enforced

with respect to each other, and when each of them may insist upon contribution from the others; and, as it is just and proper that such other of the stockholders as are liable under the statute should contribute ratably their proportion of the complainants' claims, we will sign a decree reversing * * *.''

See, also, *Joyce & Co. v. Eiffert,* 56 Ind. App. 190 (105 N. E. 59); *Manthey v. Schueler,* 126 Minn. 87 (147 N. W. '824); *Redington v. Cornwell,* 90 Cal. 49 (27 Pac. 40); *Vandiver & Co. v. Pollak,* 107 Ala. 547; *Cary v. Holmes,* 16 Gray (Mass.) 127; *Van Petten v. Richardson,* 68 Mo. 379; *Mason v. Lord,* 37 Mass. 447; *Craig v. Ankeney,* 4 Gill (Md.) 225; *Taylor v. Reynolds,* 53 Cal. 686; *Allen v. Fairbanks,* 45 Fed. 445; *Jackson F. & M. Ins. Co. v. Walle,* 105 La. 89 (29 So. 503); *Pope v. Merchants' Tr. Co.,* 118 Tenn. 506 (103 S. W. 792); *Graves v. Denny,* supra; Pomeroy's Equity Jurisprudence, Section 2338.

As may be noted in many of the foregoing cases, the rule of contribution has been frequently applied where one stockholder has himself paid more than his due proportion of the debts of the corporation; and it is immaterial that his payment was voluntary, since he was under liability. We perceive no reason, in principle, nor do we find any suggested in the authorities, why the same rule should not apply where his payment was to the corporation for stock, and the fund to which he made unequal contribution has been exhausted, and there were others equally liable, in proportion to their subscriptions, with him to that fund and for the debts, paid and unpaid. The right of contribution depends not on the fact that they were both defrauded and both suffered a loss on that account, but upon the fact that they were both liable to contribute to a fund to pay the debts of the corporation, notwithstanding the fraud, and that they have made unequal contributions to it. It is not that they have suffered unequal losses by reason of a fraud practiced upon them, but that they were under an equal or ratable liability, which they have not discharged in that proportion.

Nor do we see how the mere relative time of their subscription, in the absence of any claim that those seeking contribution participated in the fraud by which the others were induced to subscribe, affects the question. When it is determined that a given subscriber is liable for the unpaid portion of his subscription, in favor of corporate creditors and the receiver, equality of

liability, in proportion to their subscriptions, with other sub-scribers is established; and it is uniformly recognized that, where there is equality of liability, equality of burden may be enforced by contribution.

There is nothing in the case of *State ex rel. Havner v. Des Moines Union Stock Yards Co.*, 197 Iowa 987, inconsistent with our conclusion. The discussion and decision in that case were carefully limited to the right of a receiver, where the debts of a corporation were all paid, to maintain an action for contribution among, and exclusively for the benefit of, the stockholders.

We turn to a consideration of the questions affecting individual parties.

VII. The appeal of Tolliver, executor of Mary Richardson, deceased.

The deceased, Mary Richardson, subscribed for a total of 400 shares of the capital stock of the corporation, upon which she paid $17,800. She had been a resident of Greene County, and her estate was being administered there. Her executor procured an order of the probate court of that county, authorizing him to commence suit in Polk County against the receiver and others. He commenced such a suit in equity, in which he set up certain so-called repurchase contracts entered into between the decedent and the corporation, whereby the latter agreed to repurchase the stock for which decedent had subscribed; alleged that she was induced to subscribe for the stock by fraud of the corporation and its officers, and that the stock was worthless; and asked the allowance of a claim against the receiver for the full amount of her subscription. The receiver answered the petition, and filed a cross-bill in which he asked judgment against the executor for the amount unpaid on the subscription. This action was consolidated with the present proceeding, and properly so, we think. After the consolidation, but before the trial, the executor dismissed the claim on his part for affirmative relief, and moved for the dismissal of all proceedings against him. His only contention in this court, aside from the questions hereinbefore disposed of, is that the district court of Polk County was without jurisdiction to render judgment against the estate or the executor; that any claim to

10. ACTIONS: consolidation: law and equitable actions.

11. ACTIONS: dismissal: effect on cross-petition.

recover the unpaid portion of decedent's subscription must have been prosecuted in the probate court in Greene County.

At the time of the consolidation, the executor was prosecuting a claim to recover from the receiver the whole of decedent's subscription, and the receiver, by cross-bill, was asking to recover the unpaid portion of the subscription. The executor had invoked the jurisdiction of the court. Whether the receiver in that action could have secured affirmative relief, either before or after the dismissal of the executor's claim, we have no occasion to determine; but it cannot be doubted that, if the facts established his right to affirmative relief, this would have presented a good defense to the executor's demand. The executor was also a party to, and had answered, the petition of the General Fireproofing Company. The receiver intervened in that action, presenting his claim to recover unpaid subscriptions. After the consolidation, the executor answered the petitions, as amended, of the plaintiffs in the original action, of the General Fireproofing Company, and of the receiver. As we have said, upon the issues as ultimately presented in the consolidated suit, the subscriber defendants were properly joined, and were suable in Polk County. Section 3465, Code of 1897 (Section 10975, Code of 1924), expressly authorizes the inclusion of the representatives of deceased persons with others in such an action.

There was no error in overruling the motion to dismiss filed in the consolidated suit; for the action was maintainable in that court against the executor, and he was in court, and had joined issue upon the questions there presented.

VIII. The appeal of the Grimes Savings Bank.

The Grimes Savings Bank purchased of the corporation certain notes signed by William Robbins. The notes bear the following indorsement:

"Demand, notice and protest waived and payment guaranteed.

"Selway Steel Post & Fence Co.,
"H. H. Budke, Secy.,
"H. F. Wilson."

The claim of the bank is to recover upon this indorsement, as against the receiver. The notes were transferred to the bank and the indorsements made in December, 1919, and January,

12. Bills and Notes: indorsement: ratification of unauthorized indorsement.   1920. It appears to be conceded, and the evidence shows, that the indorsements were made, and the name of Budke therein written, by H. F. Wilson. Budke was both secretary and general manager of the corporation. Before the execution of the notes in question, the board of directors of the corporation had, by resolution, authorized the general manager by name to indorse the name of the corporation on "commercial paper of the corporation." The authority of Wilson to sell the notes, as distinguished from authority to make the corporation liable by indorsement, cannot, we think, be questioned. The bank paid for the notes by certificates of deposit payable to the corporation. We do not understand it to be claimed that the corporation did not receive the certificates. There is in evidence a writing under date prior to the sale of the notes, as follows:

"This is to certify that Howard F. Wilson has authority to indorse the name of the Selway Steel Post & Fence Company, by H. Budke, to the notes of William Robbins * * *."

Budke's name thereon was written, however, by Miss Raridon, an employee in his office; and her authority to do so is questioned. But, aside from the question of original authority to make the indorsement, we are of the opinion that the evidence shows a ratification. Budke had authority to indorse the notes in the name of the corporation. He therefore had authority to ratify the indorsement made in his name by Wilson, even if the latter's act be assumed to have been unauthorized. *Young v. Inman & Nelson*, 146 Iowa 492; *Horrabin & Co. v. McCallum*, 191 Iowa 441.

There is testimony that, after the purchase of the notes, and before the making of application for the receiver, Budke said to the cashier of the bank that the corporation was behind the notes, and would pay them if the makers did not, and to Mr. Myerly, who had them for collection, that the indorsements were all right; and they would stay back of them. Concerning these conversations, Budke testified:

"I presume I told him [the cashier] they were all right, and I would see that the notes were paid. I remember that you [Mr. Myerly] called at my office with respect to these sales several times. Well, if you remember that I told you this com-

pany would pay these notes, I probably did. I know you came to see me about it and showed the notes.''

The claim of the Grimes Savings Bank upon the indorsement of the notes of William Robbins should have been established.

IX. The appeal of Albert Copp.

This appellant, on September 18, 1919, subscribed for twenty-five shares of stock, under an arrangement which he, as a witness, details as follows:

''I did sign a subscription afterwards, but not to buy stock with. Our agreement was, under that syndicate contract, that I was to give them a note for $1,500, and $1,000 in cash, and at the end of one year that property was to be returned, accompanied with $2,500 worth of stock paid for services rendered. Dr. Langenfeld had performed some services, and had this same thing for several months, and I was to work out this year. Whenever a salesman's car was not working, I took them out; and if they wanted me to go along with them, I went; but I didn't sell any stock. I was hauling the salesmen around. I put up $1,000 that was to be returned to me, and I also gave a note for $1,500, without interest. I did that on their representation that it would be returned to me at the end of the year, and that they would also issue stock to me in payment of the services that Dr. Langenfeld had rendered. They were to return my $1,000 that I gave them, and my $1,500 note, and I was to pay for the twenty-five shares of stock with the services I had performed and the credit that I got from the services Langenfeld rendered. I don't remember whether I signed a subscription, but I probably did.''

13. CORPORATIONS: subscriptions to stock: voidable subscriptions.

Copp was also apparently indebted, on account for merchandise purchased of the corporation, in the sum of $4,300.28. Upon this account he received credits for merchandise reshipped to others on order of the corporation, for an overcharge and cash paid prior to October 30, 1920, aggregating $1,768. On the last named date, which it will be noted was while the application for the appointment of the receiver was pending, he made a settlement with an agent of the corporation, by the terms of which he paid $1,000 in cash, was to have his note returned to him, and was to receive twenty-five shares of stock, as shown by the receipt given him, which recited that it was ''in full on

commercial account and stock." The receipt also stated that the $1,000 payment receipted for was the balance on commercial account after deducting $1,000 paid on stock.

That the original scheme was fraudulent as against other stockholders and creditors of the corporation, and that Copp was a party to the fraud, and that the settlement was not a rescission of his subscription contract, but merely secured to him the benefit of the fraud, is apparent. It was voidable as to the receiver, representing creditors and stockholders. *Burnham & Van Shaick v. N. W. Ins. Co.*, 36 Iowa 632; *Osgood & Moss v. King*, supra; *Jackson v. Traer*, 64 Iowa 469; *Scoville v. Thayer*, 105 U. S. 143 (26 L. Ed. 968); *Quartz Glass & Mfg. Co. v. Joyce*, 27 Cal. App. 523 (150 Pac. 648); *Carnahan v. Campbell*, 158 Ind. 226 (63 N. E. 384); *Zabel v. New State Tel. Co.*, 127 Mich. 402 (86 N. W. 949); *Atwater v. Stromberg*, 75 Minn. 277 (77 N. W. 963); *Huster v. Newkirk Creamery & Ice Co.*, 42 Okla. 440 (141 Pac. 790, L. R. A. 1915 A 390).

There is no evidence of the value of the services rendered by Copp or Langenfeld, and they appear to have been merely nominal. Neither the original contract nor the settlement constitutes any defense to the claim of the receiver or of the other stockholders.

The demand against Copp was for the unpaid balance of his subscription, $1,500, and the amount unpaid on the account after crediting the last $1,000 thereon; and the judgment below granted this relief.

Copp was a resident of Carroll County, and moved, at various stages of the proceedings, for a change of place of trial to the county of his residence. That his motions were good as to the claim upon the account must be conceded. He was also, as he insisted, entitled to a jury trial upon that claim. When these motions were overruled, he pleaded a breach of warranty of the merchandise sold him, and the settlement.

14. VENUE: place of trial: improper joinder in foreign county.

We conclude that he was entitled to have the cause of action upon the account transferred to Carroll County, and that the judgment against him upon the account was erroneous.

X. Appeal of Fred Brown.

Brown, in June, 1919, subscribed for twenty-five shares of stock, under an agreement concerning which he testified:

"He. [Neiland, the stock salesman] wanted me to take some stock in the thing, so I gave him a check for $1,000 and a note for $1,500. They were to return the money and the note within a year, and also give me interest on the money."

On cross-examination, he said:

"With regard to my understanding that, as a result of this transaction with Neiland, I was to get this twenty-five shares of stock and also get back my notes and my cash, with 25 per cent interest, at the end of the year, I think that was the agreement. It was along that line."

He also testified to certain representations made by Neiland as to the operation of the corporation, and that he relied 15. CORPORATION's: upon them. He subsequently signed a so-called subscriptions to "Associate Directors' Syndicate Agreement," stock: voidable subscriptions. which provided for the distribution among socalled associate directors of the amount, above par and selling cost, realized from the sale of 4,000 shares of stock.

Brown's note was sold to H. I. Montgomery, who, on September 14, 1920, procured judgment thereon against Brown. The judgment was paid by the corporation.

Brown claims to have rescinded his stock subscription. He testified that, at some time in the fall of 1920, Budke agreed to refund the $1,000 he had paid, and return his $1,500 note; that, when he learned of the sale of his note, he was trying all the time to get his note and money back. Just when the agreement with Budke was made, does not clearly appear. Brown testified, however:

"I think it was in November, 1920, that I found out they had a judgment against me here, and I came down to see about it, and Budke or someone had taken care of it, and it was marked 'all paid.'"

The judgment against Brown was satisfied November 15, 1920. Again, he said:

"I think it was after the receiver was appointed that Robinson and I were down there, after I heard that judgment had been rendered against me."

A careful examination of Brown's testimony fails to reveal anything that can be construed into a notice of rescission, or a demand for the return of his note and money on the ground of fraud in the procuring of his subscription. On the contrary,

the plain inference is that he was trying, not to rescind his contract of subscription, but to enforce it,—that is, to secure the return of his money and note under the agreement of Neiland. Neiland testified, as a witness for Brown, that he told Brown that, if he would buy the $2,500 of stock and would help to sell the stock in the vicinity, for his services in that capacity as director the corporation would return him his money on July 10, 1920, with 25 per cent interest, and he would have his stock free. Budke testified that he agreed to return Brown's money because of the agreement which Neiland had made.

The evidence does not show any rescission or attempt to rescind on the ground of fraud practiced upon Brown before the application for the receiver, or indeed at any time, but rather a fraud upon creditors and other stockholders, to which Brown was a party. What has heretofore been said of such contracts is applicable here. The judgment against Brown was proper.

XI.  The appeal of H. H. Fritz.

The only question raised by this appellant that is not, in effect, disposed of by what has been heretofore said, relates to his contention as to the amount of his subscription. He testified that he agreed to subscribe for five shares of stock at $100 per share, and gave two notes: one for $400, which he paid, and one for $100. His subscription contract, as introduced in evidence, is for ten shares, and there is among the assets of the corporation in the hands of the receiver his note for $600. There appear, written across the face of the note, the words: "Canceled, S. S. P. Co. 8-31-20." The note was in this condition when it came into the hands of the receiver. There is no explanation in the record as to why or by whom this notation was made. Fritz testified that, when Budke called to see him in reference to the sale of bonds, which was in an effort to refinance the corporation after the appointment of the receiver, Budke asked how many shares he had bought, and that he told him, "five," and that Budke said:

"We will have that fixed up when we go back to Des Moines."

The testimony of Fritz that he agreed to subscribe for only five shares is uncontradicted, save by the subscription contract and the note. While the circumstances under which he signed these documents, as testified to by him, show negligence on his

part, still, in view of the fact that the note appears to have been canceled by the corporation prior to the appointment of the receiver, we are inclined to the opinion that this appellant should be held only for the $100 unpaid on his admitted subscription.

XII.  Appeal of W. A. Eikenberry.

The claim of this appellant is based upon the indorsement of a note of $3,632 by the corporation.

On October 28, 1920, after the application for the appointment of a receiver, but before the appointment was made, one O. N. Frazier, acting for the corporation, procured the note in question to be executed by the maker, John A. Pos, in renewal of other notes which he had given to the company. Frazier, a day or so later, and before the receiver was appointed, proposed to give the note in payment for an automobile. The automobile dealer was unwilling or unable to accept it, and proposed to Eikenberry that he purchase it. The latter offered $2,700 for the note. This offer was accepted by Frazier, who requested Eikenberry to make his check payable to the automobile dealer, which was done; and Frazier took the car. Frazier exhibited to Eikenberry, and gave him a copy of, written authority from Budke, as secretary, treasurer, and general manager of the corporation, "to indorse the name of the corporation on notes * * *" and to make collections for the corporation, "to sign contracts and agreements and to do all the things that might be done by myself, and his signature shall have the same force and effect as if done by myself in my official capacity."

It is claimed that Budke's signature to this document was written by Frazier; but, be that as it may, Budke testified that he gave Frazier authority to indorse notes and exchange them for drafts or currency, and that he may have given him a letter like that in evidence. Frazier testified that he had written authority from Budke substantially in the form exhibited to Eikenberry.

On October 12, 1920, the board of directors, by resolution, gave Budke authority "to act for and on behalf of the corporation in signing the name of the corporation to all instruments of every kind and nature necessary to be executed by the corporation; to indorse on behalf of the corporation every form and kind of commercial paper and to sell, assign and pledge the same; to

make and execute notes of the corporation; * * * to enter into contracts on and in behalf of the corporation as may be necessary in the conduct of its business."

The authority of Frazier to sell and indorse the note for the corporation is abundantly established.' But it is insisted that he did not have authority to use the note and indorse the corporation's name upon it for the purpose of buying an automobile for himself, and that Eikenberry had full knowledge that he was so using it.

It appears without dispute that Frazier was employed by the corporation at a salary of $250 per week, and that his duties took him from place to place; that Budke had previously agreed to buy Frazier a car and let him pay for it later out of his salary; that, after getting a price on the car in question, Frazier reported the matter to Budke, who told him to go ahead and use this note to buy the car, and pay for the car later out of his salary. Such an arrangement would not seem to be beyond the broad powers conferred on Budke by the board of directors. While it is reasonably certain, especially in view of the pending application for the appointment of a receiver, and other facts now shown, that Budke and Frazier were not acting in the interest of the corporation, but for the advantage of the latter, that fact was not then so apparent as to charge Eikenberry with notice of a want of authority on the part of Frazier to indorse the note, even though he knew that the proceeds went to the purchase of the car for Frazier. He had no knowledge of the impending receivership. Frazier had actual authority from Budke to so use the note and indorse it, and Budke had authority to make such an arrangement. This is all that is essential to Eikenberry's right to recover on the indorsement of the unpaid note, and his right is not to be defeated by Frazier's failure to repay the corporation for the car, or by the bankruptcy of the maker of the note. The claim should have been allowed.

XIII. The appeals of P. J. Weil and J. C. Weil.

These appellants are brothers, and each subscribed, at various dates during 1919, for a total of $51,000 worth of stock.

**17. CORPORATIONS: subscriptions to stock: unexecuted rescission: relief against receiver.** On April 15, 1920, it appears, a contract was entered into between the Weils and the corporation, which is not set out in the abstract, but which we understand counsel to concede provided that their subscriptions were canceled, the money they had paid thereon was repaid to them, and their notes in the hands of the corporation were returned to them, and the corporation agreed to protect the Weils from liability upon the other notes which they had given, and which had passed out of the hands of the corporation. The Weils asked, as affirmative relief against the receiver, the allowance of claims for the amount of the notes not turned over to them.

The court below held that the contracts of subscription had been rescinded before application for the appointment of a receiver was made, and dismissed the petitions of all parties to recover thereon, as against the Weils, but denied their claim against the receiver. Both parties appeal. The Weils had been given the so-called associate-director-syndicate contracts which have been referred to above, and also had an understanding with the stock salesman of whom they purchased their stock that he would resell it for them at a profit. We do not understand that they held any obligation of the corporation or its officers to repurchase their stock, and it does not appear that the contract of April 15, 1920, was entered into in fulfillment of any such obligation or promise. On the contrary, it appears, and the lower court must have so found, in respect to the liability of the Weils, that the subscriptions were rescinded because of fraud in their procurement. We agree with this conclusion, but we are unable to agree with the further holding below that the Weils were not entitled to the full benefit of their rescission.

It is doubtless true that they subscribed for stock far beyond their means, and that they did so in the expectation, induced by the fraudulent representations made to them, of reselling the stock at a profit. An expectation of profit is the inducement for most business transactions. They signed letters recommending the stock to their friends as a profitable investment; but this, too, seems to have been done under the influence of the fraudulent representations, and in the belief, thereby induced, that their statements were true, rather than as a knowing participation in the fraud. Either they were not entitled

to rescind at all, and should be held liable for the unpaid portions of their subscriptions, or they were entitled to rescind entirely. The corporation while a going concern acquiesced in their demand for a rescission, and obligated itself to make the rescission complete and effective. It was not beyond the power of its officers to do what the courts would have required it to do; and if it was within the scope of their authority to agree to a rescission to the extent of returning what the corporation had received and still had, it was not beyond their power to agree to protect the Weils against the notes that had passed out of their hands.    Under a rescission 'of the contracts of subscription, whether enforced by the court or agreed to by the corporation, it was bound to return what it had received.   By selling these notes it had already received the benefit of them.   To deny the claim of the Weils is to allow the corporation to retain that benefit, which, under the law and under its own agreement, it was not entitled to, and to deprive them of the benefit of a rescission which was promptly made on discovering the fraud, and to which the corporation when a going concern agreed.

The contract of rescission was not, we repeat, the carrying out of the terms of a fraudulent subscription whereby the Weils were to receive stock upon different terms than other stockholders, or the corporation was to repurchase the stock, but was a recognition by the corporation of their right to rescind for fraud,— a right that all authorities agree may be enforced so long as the corporation is a going concern.

We are of the opinion that the court was in error in denying the claims of these appellants.

XIV.   The appeal of John Schnepel.

The only question raised by this appellant that is not disposed of by what has heretofore been said, is in respect to a note for $2,400 signed by B. C. Vance, which Schnepel turned over to the corporation at the time of his subscription. He subscribed for 25 shares of stock, gave a check for $1,000, and indorsed and turned over the Vance note under a written agreement by the corporation to collect the note for Schnepel, retaining $1,500, plus interest, and to pay him the balance. The lower court rendered judgment against Schnepel for $1,500 unpaid on his subscription, and ordered the Vance note returned

18. CORPORATIONS: subscriptions to stock: unallowable plea of satisfaction.

to him, on payment of the judgment. This was clearly correct. The Vance note was not taken in payment, and has not been collected.

XV. Complaint is made in argument on behalf of J. F. Martins and F. W. Martins, appellees in the appeal of the receiver, of that portion of the decree below that required them to turn over to the receiver certain notes received from the corporation as collateral security to the agreement of the corporation, upon rescission of their contracts of subscription, to return to them their own notes given upon their subscriptions. The record, however, does not show that they have appealed.

On the appeal of the Grimes Savings Bank, the case is reversed, with costs, and the claims of the appellant allowed for the amount due on the Robbins notes.

On the appeal of Albert Copp, the judgment against him for the amount found due on the account is reversed, without prejudice to the right of the receiver to proceed in the proper county; and otherwise the judgment is affirmed. The costs made on this appeal will be equally divided between the appellant and the receiver.

On the appeal of H. H. Fritz, the judgment against him is reduced to $100 and interest, and for that amount affirmed. The appellant will pay one third of the costs on this appeal.

On the appeal of W. A. Eikenberry, the judgment denying his claim against the receiver is reversed, with costs, and the claim allowed in the amount due on the note of $3,632.

On the appeals of P. J. and J. C. Weil, the judgment is reversed, with costs, and the claims of appellants against the receiver allowed in the amounts claimed.

In all other respects, the judgment and decree are affirmed. —*Reversed in part; affirmed in part.*

EVANS, STEVENS, and DE GRAFF, JJ., concur.

FAVILLE, C. J., and ALBERT, J., dissent.

MORLING, J., not participating.